539 A.2d 657

**Bradley William BOHNERT**

v.

**STATE of Maryland.**

**No. 117, Sept. Term, 1987.**

Court of Appeals of Maryland.

April 7, 1988.

Sherrie B. Glasser, Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for appellant.

Judson P. Garrett, Jr., Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Ann E. Singleton, Asst. Atty. Gen., all on brief), Baltimore, for appellee.

Argued before ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ., and CHARLES E. ORTH, Jr., Associate Judge of the Court of Appeals of Maryland (retired), Specially Assigned.

CHARLES E. ORTH, Judge, Specially Assigned.

The linchpin of this case is credibility. If the jury believed Alicia Rojas, a child under the age of 14 years, then Bradley William Bohnert would be guilty of abusing her and committing a sexual offense in the second degree upon her as charged. If the jury did not believe Alicia, Bohnert would be not guilty of those crimes. *See Wilson v. State,* 261 Md. 551, 563–564, 276 A.2d 214 (1971). As is apparent from the verdicts of guilty returned by the jury in the Circuit Court for Cecil County, the jury believed Alicia. Bohnert claims, however, that the jury could not be "fairly" convinced, *id.* at 564, 276 A.2d 214, because its province was

improperly invaded by an opinion of an "expert in the field of child sexual abuse," that Alicia "was, in fact, a victim of sexual abuse," which the trial judge permitted the jury to consider.

Bohnert was twice tried before a jury in the Circuit Court for Cecil County and convicted of the charges at each trial. The Court of Special Appeals reversed the judgments entered in the first trial in an unreported opinion, *Bohnert v. State*, No. 1235, September Term, 1984, filed 30 April 1985 (*Bohnert I*). It held that the trial court committed reversible error "in permitting the State to elicit testimony by [the child's mother] that her daughter's version of the events was the 'whole truth,'" as this invaded the province of the jury. *Id.*, slip opinion at 7–8. The intermediate appellate court further held that it was reversible error for the trial court to permit the "expert" to testify that Bohnert was the criminal agent, as this also invaded the jury's province. *Id.*, slip opinion at 11–13. The appellate court concluded, however, that the trial court "did not abuse its discretion in permitting [the expert] to give [her] opinion [that the child had been, in fact, sexually abused], since it was within the scope of [the expert's] area of expertise." *Id.*, slip opinion at 12. The Court of Special Appeals affirmed the judgments entered in the second trial in the face of contentions which included that the trial court erred in permitting the "expert's" opinion to go before the jury. *Bohnert v. State*, No. 1264, September Term, 1986, filed 25 May 1987, unreported (*Bohnert II*). We granted Bohnert's petition for the issuance of a writ of certiorari. The primary question he presents is whether the trial court erred in admitting into evidence the opinion of the "expert."

The circumstances leading to the indictment of Bohnert were these. Alicia, her brother, her mother, and Bohnert were living in an apartment consisting of a bedroom, a living room, a kitchen, and a bath. The children slept in the bedroom; the mother and Bohnert slept in the living room. Alicia alleged that frequently during the year 1983, Bohnert would take her into the bathroom and cause her to engage

in acts, which as she described them, amounted to fellatio and anal intercourse.

There was testimonial evidence tending to show that Alicia was not without improper motivations in her accusations against Bohnert. She first recounted her alleged experiences upon being confronted about a miniature whiskey bottle found in her possession at school. Also she may have been jealous of her mother's relationship with Bohnert and was upset because Bohnert might take her mother away. On two occasions she recanted her allegations to a friend of her mother, to a lawyer, and to an assistant state's attorney. She said, however, that her denials were prompted by fear and by the probability that no one would believe her. She had been removed from the custody of her mother and reaffirmed her allegations only when she was permitted to return to her mother. Her graphic description of what occurred between Bohnert and her could be explained by the fact that she had perused sexually explicit magazines which she and her brother found in the apartment. She initially testified that she could not remember anything that had happened between her and Bohnert, and eventually, after a short recess, testified, reluctantly it seemed, about what had occurred.

It was clearly apparent that the State's case hinged solely on the testimony of Alicia. There was no physical evidence to support her story. When she first told her mother what had occurred, the mother took her to a hospital to be examined. The family's physician testified that he reviewed the hospital report and that it did not disclose any evidence of abuse. Also, the physician had seen Alicia during the period the acts were alleged to have occurred. He did not see any signs of sexual abuse. Another physician testified that he had examined Alicia for alleged sexual abuse and "did not find any direct evidence of any new or old physical or genital injury or scarring." There were no eyewitnesses to the alleged acts. Alicia's credibility was crucial.

The State threw a social worker, Dora Temple, into the breach. It produced her to conclude its case in chief. She

was a "Protective Service Investigator with the Department of Social Services." After extensive examination of her qualifications, the court, over objection, ruled that she was an "expert in the field of child sexual abuse." Early on, after her acceptance by the court as an "expert," she was asked by the State whether she had "an opinion as to whether or not this child ... was sexually abused?" She answered that she had an opinion.[1] Asked what was her opinion, she replied:

> It's my opinion, based on the information that Alicia was able to share with me, that she was, in fact, a victim of sexual abuse.

It appeared that as a result of a telephone call Temple conducted an investigation. It began with an interview of about an hour with Alicia at her school. She talked also to Alicia's mother. Thereafter she spoke again to Alicia. During the conversation Alicia "related certain information to [Temple], which [Temple] deemed appropriate and necessary in gathering for [her] investigation." It was at that point and on that foundation, that Temple was asked:

> Based upon the information that you had occasion to gather from Alicia ..., [her mother] and from any other source, do you have an opinion as to whether or not this child, Alicia ..., was sexually abused?

Her opinion followed.

On cross-examination it was elicited that Temple's opinion was based on what Alicia told her and on interviews with

---

1. Prior to the second trial, Bohnert filed a motion in limine to preclude Temple from voicing an opinion that the child was a victim of child abuse. As we have seen, in reversing the judgment rendered at the first trial, the Court of Special Appeals held that it was not error for the court to permit Temple to testify that the child had been abused. *Bohnert v. State*, No. 1235, September Term, 1984, unreported, filed 30 April 1985, slip opinion at 11–13. The trial court observed that it was going to follow the holding of the Court of Special Appeals and denied the motion.

 We note that during Temple's testimony, all that related to the expression of her opinion was subject to repeated and timely objections by the defense.

Alicia's mother and "other people." The "other people" were not identified. Temple asserted that her opinion, "more than likely," would be the same "if [she] discovered that the child had told numerous persons on numerous occasions that this had never happened." That it would be the same "if [she] discovered that this child admitted that she was scared to death that [Bohnert] was going to leave with her mother." That it would be the same "if [she] discovered that the child was afraid to be left alone, if mother left with [Bohnert]." That it would be the same "if the hospital reports showed that there was no sign of sexual abuse." Temple said she had seen the "front page" of the hospital report, "where it indicated there were no marks."

Temple admitted that she had not subjected Alicia "to any type of objective test." She agreed that she believed that she had "a certain sense about children" so that it was not necessary to give them tests. She declared: "I never use tests in my investigations." She indicated that she felt that she had no need to review medical reports "in making an expert opinion as to whether or not a child has been abused." Although she was interested in what the reports had to say, she did not think that it was important. "Frequently in sexual abuse there's no physical evidence. It's not an unusual finding." Defense counsel referred her to a book by Sigmund Freud, "The Origins of Psychoanalysis," in which Freud discussed his research on sexual approaches. Temple had not read the book. Counsel quoted a passage from it:

When I realized that these sexual approaches had never actually occurred, that they were just fantasies made up by my patients or perhaps even suggested by myself, I was at my wits' end.

Temple said that she did not necessarily agree that "a lot" of allegations of sexual approaches were "things made up," but that, in any event, it did not "in any way change [her] opinion." Defense counsel pressed Temple on the basis of her opinion. He asked "if the information she received has

really, in effect, come from the child,"—what the child told Temple, the mother and others. The court commented: "I don't know what her other sources were." Temple stated: "Strongest part of my opinion is based on the child's statement, because of her age." She indicated there were other sources of information, but those sources were never identified.

Bohnert took the stand in his own defense and categorically denied the allegations.

It is perfectly clear, as we have indicated, that the outcome of this case depended on the jury's determination of the credibility of two witnesses, the accuser and the accused. It is equally clear that the opinion of the "expert in the field of child sexual abuse" was of utmost significance in that determination. If the child's allegations were believed, they would establish both the corpus delicti of the crimes charged and the criminal agency of Bohnert.

The prosecutor fully appreciated the importance of Temple's opinion. In his opening argument to the jury he stressed her experience and expertise, called attention to the investigation she conducted, which she was "trained to do," and observed that the "investigation revealed to her that Alicia Rojas was, in fact, abused sexually." He declaimed:

> That's her expert opinion. That's what she concluded. There was no other person before you presented by the defense ... to contradict that. They presented no evidence that no, she wasn't abused.

He asserted:

> You have a very important point ... an expert in this field saying this child was sexually abused.

He concluded his argument:

> You have an expert opinion in this case this child was sexually abused. It's unrefuted, not disputed, not contradicted and you have [the child's] testimony about what happened and how it happened and you have her testimony ... about who did it. There's no question about who

did it and I ask you to find verdicts of guilty on all counts.

In the State's closing argument, the prosecutor again declared: "You have an expert opinion, that's been unrefuted that [the child] was sexually abused."

■ In permitting Temple's opinion to go before the jury at the second trial, the judge indicated that he was standing by the decision of the Court of Special Appeals in *Bohnert I.* In affirming the judgments in *Bohnert II,* the Court of Special Appeals observed that its ruling on the matter in *Bohnert I* was the law of the case. Therefore, it concluded, the judge did not err at the second trial in admitting the opinion. *Bohnert II,* slip opinion at 7–8. Although the ruling of the intermediate appellate court may have been the law of the case with respect to the circuit court, the Court of Appeals is not bound by it. We think that the Court of Special Appeals was wrong in its ruling in *Bohnert I.* It follows that the trial judge, led down the primrose path by *Bohnert I,* was also wrong.

We laid out in *State Health Dep't v. Walker,* 238 Md. 512, 209 A.2d 555 (1965), "upon what conditions and under what circumstances may a witness deemed to be an expert, express an opinion in the field of his expertise." *Id.* at 520, 209 A.2d 555. We noted that this Court has dealt many times with expert and opinion testimony. We said, *id.*:

An expert opinion derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert. *Doyle v. Rody,* 180 Md. 471, 25 A.2d 457 [1942]. The premises of fact must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown. *State, Use of Stickley v. Critzer,* 230 Md. 286, 186 A.2d 586 [1962], and cases cited therein; *Hammaker v. Schleigh,* 157 Md. 652, 147 Atl. 790 [1929]. The opinion

of an expert, therefore, must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support such conclusion. The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess. *Marshall v. Sellers*, 188 Md. 508, 53 A.2d 5 [1947].

We put it succinctly in *Worthington Constr. v. Moore*, 266 Md. 19, 29, 291 A.2d 466 (1972): "An expert's judgment has no probative force unless there is a sufficient basis upon which to support his conclusions." *See* cases therein cited. *See also Spence v. Wiles*, 255 Md. 98, 101–103, 257 A.2d 164 (1969).

We discussed the function of an appellate court regarding the admissibility of expert testimony in *Radman v. Harold*, 279 Md. 167, 367 A.2d 472 (1977).

> [W]e again recognize that the admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal. . . . It is well settled in this State, however, that the trial court's determination is reviewable on appeal, . . . and may be reversed if it is founded on an error of law or some serious mistake, or if the trial court clearly abused its discretion.

*Id.* at 173, 367 A.2d 472 (citations omitted). *See Scott v. State,* 310 Md. 277, 293, 529 A.2d 340 (1987), and cases therein cited.

In Bohnert's appeal to the Court of Special Appeals from the judgments entered in his second trial, he urged that the trial judge erred in admitting Temple's opinion because "no basis was developed upon which to predicate that opinion." *Bohnert II,* slip opinion at 8. The intermediate appellate court disposed of this contention by stating that "[t]he admission of expert testimony is within the sound discretion of the trial court," citing *Nolan v. Dillon*, 261 Md. 516, 276

A.2d 36 (1971). It then looked to the rule that the exercise of that discretion will seldom constitute a ground for reversal, unless there is clear error or abuse of that discretion. *Bohnert II,* slip opinion at 8–9, *citing Raithel v. State,* 280 Md. 291, 301, 372 A.2d 1069 (1977), and *Brown v. State,* 29 Md.App. 1, 11, 349 A.2d 359 (1975). Contrary to the belief of the Court of Special Appeals, we think that in admitting the opinion, the trial judge abused his discretion.

■ The record leads to no other conclusion than that Temple's opinion was founded only upon what Alicia said had occurred. As far as can be gleaned from the record, the source of all the evidence concerning the incidents was the child—what she told Temple, what the mother said the child told her, what the mother's friend said the child told her. Temple proffered no evidence as to objective tests or medically recognized syndromes with respect to the child. Nor did Temple present any evidence as to the child's behavior compared to general behavioral characteristics of child abuse victims. There was no physical evidence on which to base the opinion. There were no eyewitnesses. The opinion was reached on the child's unsubstantiated averments and "a certain sense about children" which Temple believed she possessed. Temple's intuitive reaction to the child's story did not suffice to provide a foundation for the opinion that the child was, in fact, sexually abused. The opinion of Temple was not based on facts sufficient to form a basis for her opinion. There were no facts to show that Alicia's allegations were true, so that a reasonably accurate conclusion that the child had been sexually abused could be made. The conclusion that she had in fact been abused was no more than mere conjecture or guess. The short of it is that the very groundwork for Temple's opinion was inadequately supported.

■ Our discussion concerning the discretion of the trial judge regarding expert testimony was on the assumption

that there may be circumstances in which an "expert in the field of child sexual abuse" could properly voice an opinion that a child had been sexually abused. Then the admissibility of such testimony would be within the sound discretion of the trial judge. We concluded that in the circumstances of this case, admitting the opinion in evidence was an abuse of discretion. We have an alternative reason, however, for concluding that, in the circumstances of this case, the trial judge erred in admitting the opinion. We think that the opinion was inadmissible as a matter of law.

 In a criminal case tried before a jury, a fundamental principle is that the credibility of a witness and the weight to be accorded the witness' testimony are solely within the province of the jury. *Battle v. State*, 287 Md. 675, 685, 414 A.2d 1266 (1980).[2] Therefore, the general rule is that it is error for the court to make remarks in the presence of the jury reflecting upon the credibility of a witness. *Elmer v. State*, 239 Md. 1, 10–11, 209 A.2d 776 (1965). It is also error for the court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying. *Thompson v. Phosphate Works*, 178 Md. 305, 317–319, 13 A.2d 328 (1940); *American Stores v. Herman*, 166 Md. 312, 314–315, 171 A. 54 (1934). The Court of Special Appeals said in *Mutyambizi v. State*, 33 Md.App. 55, 61, 363 A.2d 511 (1976), *cert. denied*, 279 Md. 684 (1977):

> Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination.

---

**2.** *But see Kucharczyk v. State*, 235 Md. 334, 338, 201 A.2d 683 (1964) (testimony so contradictory as to have no probative value); *Ray v. Bassil*, 30 Md.App. 550, 352 A.2d 888, *cert. denied*, 278 Md. 715 (1976) (evidence testimony tends to establish known to be impossible). *See also* Comment, Maryland Pattern Jury Instructions—Criminal 3:10 (1987).

*See State v. Allewalt,* 308 Md. 89, 121, 517 A.2d 741 (1986) (Eldridge, J., dissenting).

We have resisted exhortations to admit evidence regarding polygraph tests. "No dispute exists to the well established rule that evidence of polygraph tests is not admissible.... The results of a lie detector test, as well as the fact of taking such a test, are not admissible." *Guesfeird v. State,* 300 Md. 653, 658, 480 A.2d 800 (1984); *Johnson v. State,* 303 Md. 487, 513, 495 A.2d 1 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). *See also* cases cited in *Allgood v. State,* 309 Md. 58, 72, 522 A.2d 917 (1987). We have not recognized that a witness may be a more reliable lie detector than a polygraph machine. We have never indicated that a person can qualify as an "expert in credibility," no matter what his experience or expertise. We have insisted that, in a jury trial, the credibility to be given a witness and the weight to be given his testimony be confined to the resolution of all of the jurors. It is the settled law of this State that a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law.

Furthermore, we observe that it is not the function of an expert to resolve conflicting evidence. *Stebbing v. State,* 299 Md. 331, 349, 473 A.2d 903 (1984). The rationale for excluding conclusions based on the resolution of contested facts is that the conclusion requires a judgment which invades the province of the jury as the finder of facts. *Kruszewski v. Holz,* 265 Md. 434, 445, 290 A.2d 534 (1972), *citing, Calder v. Levi,* 168 Md. 260, 266, 177 A. 392 (1935). *Cf. Thompson v. Phosphate Works,* 178 Md. at 318, 13 A.2d 328.

The opinion of Temple that Alicia in fact was sexually abused was tantamount to a declaration by her that the child was telling the truth and that Bohnert was

lying. In the circumstances here, the opinion could only be reached if the child's testimony were believed and Bohnert's testimony disbelieved. The import of the opinion was clear —Alicia was credible and Bohnert was not. Also, the opinion could only be reached by a resolution of contested facts—Alicia's allegations and Bohnert's denials. Thus, the opinion was inadmissible as a matter of law because it invaded the province of the jury in two ways. It encroached on the jury's function to judge the credibility of the witnesses and weigh their testimony and on the jury's function to resolve contested facts. Inasmuch as the opinion was inadmissible as a matter of law, it was beyond the range of an exercise of discretion. In ruling on a question of law a judge is either right or wrong, and discretion plays no part. In this case he was wrong. We hold that the receipt in evidence of Temple's opinion that the child "was, in fact, a victim of sexual abuse," constituted reversible error.[3]

In view of our holding we do not reach Bohnert's contention that the trial judge erred in permitting the State to make improper closing argument.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED;

CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTION TO REVERSE THE JUDGMENTS OF THE CIRCUIT COURT FOR CECIL COUNTY AND TO REMAND THE CASE TO THAT COURT FOR A NEW TRIAL;

COSTS TO BE PAID BY CECIL COUNTY.

---

**3.** We note that the error in permitting the opinion of the "expert" to go before the jury could in no event, under the circumstances of this case, be harmless under the test enunciated in *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976). Nor were the trial judge's instructions to the jury that it was "the sole judge of the credibility or believability of the witnesses," following the usual formula of instructions on the subject, sufficient to alleviate the taint caused by the error.