827 A.2d 167

Christian ROBINSON

v.

STATE of Maryland.

No. 871, Sept. Term, 2001.

Court of Special Appeals of Maryland.

June 25, 2003.

Peter F. Rose, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Steven L. Holcomb, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Submitted before SONNER, ADKINS, and GREENE, JJ.

SONNER, Judge.

A jury sitting in the Circuit Court for Montgomery County convicted Christian Robinson of two counts of second-degree rape and one count of second-degree sex offense. The court sentenced him to concurrent twenty-year terms of imprisonment for each rape conviction and a consecutive ten-year term for the sex offense conviction. Robinson asks five questions on appeal:

1. Did the trial court err in admitting a statement by the victim to her roommate as a prompt complaint of a sexual assault?

2. Did the trial court err in admitting testimony from a police officer that the victim never gave any inconsistent statements to her?

3. Did the trial court err in admitting DNA evidence without conducting a hearing as to whether the statutory requirements of Maryland Code (2002), Courts and Judicial Proceedings Article, section 10–915 had been met?

4. Did the trial court err in admitting the DNA report under the business record exception to the hearsay rule?

5. Was there sufficient evidence of force to sustain one of Robinson's rape convictions and his sexual assault conviction?

We find no error on all but the second question. Although we answer the second question in the affirmative, because we determine the error to be harmless, we affirm Robinson's convictions.

## FACTS

Kimberly H. testified that Robinson raped her on two occasions—the evening of March 9, 2000, and again the following morning on March 10, 2000. Kimberly apparently has certain mental and physical limitations, although the nature and degree of those limitations did not emerge at trial. She was twenty-seven years old at the time of the attacks and worked part-time at a nearby nursing home as a dining room attendant. She also had a boyfriend of two years.

After spending an evening together on March 8, 2000, Kimberly and her boyfriend went to the Silver Spring Metro Station to wait for their buses home. The boyfriend's bus arrived first, and he left. While Kimberly waited on a bench for her bus, Robinson, whom she did not know, approached and sat down at the other end of the bench. They began

talking and, in the course of their conversation, Robinson told her he was twenty-three years old and then asked for her telephone number. She hesitated, but, upon further prodding, she gave him her home number. They both got on the bus and continued to converse for several minutes before her stop. Robinson told her he would call her the next night at 7:30 p.m.

The next evening, March 9th, Kimberly was alone in her apartment, which she shared with a roommate named Renee Hogan. Around 7:30 p.m., Robinson called and asked if he could come over. Kimberly recommended that they meet in a public place, but Robinson told her that he did better "one-on-one." She eventually agreed to let him into her apartment. When he first arrived, they talked and watched television. Kimberly told Robinson that she just wanted to be friends with him, which he said "was okay."

At some point, Robinson made a telephone call and seemed to be bragging that he liked the victim and wondered "how far he could go with her." After the call, he asked if he could kiss her. Kimberly told him "no," that it was not a good idea because she had a boyfriend. He nonetheless kissed her. Robinson then told her to put her feet up on the couch. She asked him why, but instead of answering, he repeated his demand. She understood by the tone of his voice that she was expected to "shut up and do it." She complied because she was "scared." He then picked her up and carried her into her bedroom.

Robinson put her down on the bed and began to undress himself and her. As he approached her, she attempted to "knee him." He said that if she tried that again he was going to hurt her. He then raped her as she told him to stop, told him he was hurting her, and cried. She also told him that she had a roommate who would be coming home soon. Robinson became nervous when the bedroom window blinds rattled, so he dressed to leave. Before he left, Kimberly wrote a "contract" that they both signed, which stated that if she became pregnant he would pay for half of the abortion.

Kimberly tried several times to call her boyfriend after the rape, but his line was busy. Renee Hogan returned home around 10:45 p.m., about fifteen minutes after Robinson had left. The roommates had a brief conversation, but the victim did not tell Renee what had happened. Kimberly explained that she and Renee "weren't really friends . . . more like business partners." She explained further that she did not call the police or her mother because she was afraid she would have to give up her apartment.

At 4:22 the next morning, March 10th, the telephone rang. Robinson told Kimberly that he wanted to come to her apartment again. She told him that she did not think it was a good idea. He then told her that his roommate had recorded part of his telephone conversation the previous evening and that he was not twenty-three years old, as he had told her earlier, but was in fact a minor. He threatened that if she did not let him into her apartment he would allege that *she* had raped *him*. Frightened, Kimberly buzzed him up to the apartment.

Robinson went to sleep on the floor of her bedroom. Kimberly tried calling her boyfriend, but the telephone was dead. She then returned to her bed. Robinson woke up and forced his penis in the victim's vagina and rectum as she cried and told him to stop. He left shortly thereafter, around 8:00 a.m. Kimberly left her apartment, got something to eat, and walked around until noon "to get [her] mind off of what happened."

As she returned to her apartment and prepared for work at approximately 12:00 p.m., Hogan woke up and walked into the living room. Kimberly told her roommate not to let any strangers into the apartment. Hogan asked her roommate several times if something had happened, causing Kimberly to finally reveal what Robinson had done. Neither of the women called the police.

Kimberly told her boyfriend what had happened at around 5:00 p.m. on March 10th, after she left work. Her boyfriend immediately called the police. Detective Merideth Dominick of the Montgomery County Police Department interviewed the victim later that evening. The detective testified that the

victim was very slow in her responses and it was difficult to keep her on a single train of thought. A physical examination later that night revealed abrasions on Kimberly's vagina.

A DNA specialist testified at trial that she had analyzed the vaginal and anal swabs taken from the victim and determined that the sperm from the vaginal swab matched Robinson's DNA, but the test from the anal swab was inconclusive. Robinson's position at trial was that he and the victim had engaged in consensual intercourse.

## DISCUSSION

### I.

Robinson first argues on appeal that the trial court erred in admitting the victim's hearsay statement to her roommate as a prompt complaint of a sexual assault because the statement was not "prompt." We turn, then, to Maryland Rule 5–802.1, which provides:

> The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:
>
> * * *
>
> (d) A statement that is one of prompt complaint of sexually assaultive behavior to which the declarant was subjected if the statement is consistent with the declarant's testimony.

To qualify under this exception, the declarant must have made the complaint "without a delay which is unexplained or is inconsistent with the occurrence of the offense," a less demanding standard than that applied to the excited utterance exception. *See Harmony v. State,* 88 Md.App. 306, 321, 594 A.2d 1182 (1991) (qualifying as a prompt complaint a statement made by the victim three hours after a sexual assault) (citations omitted).

In *Nelson v. State,* 137 Md.App. 402, 418, 768 A.2d 738 (2001), we held that a delay of twenty-four to twenty-eight

hours between the rape of a thirteen-year-old by the victim's boyfriend and the victim's report of the rape to her school counselor "would almost certainly . . . have no adverse effect on the admissibility of a prompt complaint of a sexual attack, whereas it might well be fatal to an excited utterance." We further held:

> The window of admissibility of the latter is circumscribed by the continuation of a state of excitement in the body and in the psyche of the victim. There is a glandular component. The window of admissibility of the former, by contrast, is measured by the expectation of what a reasonable victim, considering age and family involvement and other circumstances, would probably do by way of complaining once it became safe and feasible to do so. Reasonable time frames would vary with circumstances. An emotion-driven complaint to a close friend or relative, for instance, might well precede a more deliberate report to police or to medical attendants.

*Id.*

In this case, the trial court admitted the roommate's statement, reasoning:

> Very well. The Court observes that in discussing this particular hearsay exception to the hearsay rule under 802.1, the Appellate Court—one of our judges in the Appellate Court said it is a strange animal: it has gills, fins and lungs—and you have to really think at length as to why the prompt complaint exception exists, and it exists, according to the authorities, to be in essence a preemptive rebuttal of an argument, expressed or implied by a defendant that it was a consensual encounter and therefore the ultimate complaint about it being nonconsensual was fabricated; and the authorities have concluded that if one can be shown to make a prompt complaint prior, in essence—some authorities say prior to the time they may have been able to think through a scheme to come up with the fabrication—the jury is entitled to know that—not the substance of it, not the details of it, but simply that a complaint was made of sexually assaultive behavior; and the Court concludes that

it is relevant in this case when you consider all of the circumstances.

You have a person with some limitations on her, at least on her communicative skills, who reported it to her roommate, although only after an inquiry was made—a detailing crew was made—by the roommate some five hours, roughly, after the assault occurred—the second assault—and although there was some discussion between the two of them after the first assault and there was no report.

Nevertheless, considering all of the circumstances of this particular case, the Court believes that it is relevant, and under Rule 5–104(a) the Court will permit inquiry by the State of the complaining witness of the alleged victim as to, just generally, was there—did she complain to Renee of the sexually assaultive behavior.

█ We uphold the court's well-reasoned decision. Kimberly testified that Robinson sexually assaulted her on the evening of March 9th, sometime between 9:00 p.m. and 10:30 p.m., and on the morning of March 10th, before 8:00 a.m. She disclosed the assaults to her roommate after 12:00 p.m. on March 10th. That put her first disclosure at approximately fifteen hours after the first rape, and five hours after the second rape, well within the standard of promptness set forth in *Harmony* and applied in *Nelson*.

## II.

Robinson argues that the court erred in permitting Detective Dominick to testify that, in her several interviews with the victim after the sexual assault, she did not report anything "inconsistent." We agree with Robinson that admitting the officer's conclusory statement was error and could invade the province of the jury. Nonetheless, we also conclude beyond a reasonable doubt that, given the overwhelming weight of evidence properly introduced at trial, the erroneously admitted testimony was collateral, could not have influenced the jury, and was therefore harmless. *See Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976).

 It is ordinarily within the sound discretion of the trial court to determine the admissibility of evidence. *Conyers v. State,* 354 Md. 132, 176, 729 A.2d 910 (1999). The relevant evidentiary law here is that "a witness, expert or otherwise, may not give an opinion on whether [the witness] believes [another] witness is telling the truth. Testimony from a witness relating to the credibility of another witness is to be rejected as a matter of law." *Bohnert v. State,* 312 Md. 266, 278, 539 A.2d 657 (1988).

 In *Bohnert,* the Court of Appeals held that a social worker's expert testimony that a child was a victim of sexual abuse, supported only by the child's averments, was "tantamount to a declaration ... that the child was telling the truth and [the defendant] was lying." *Id.* at 278–79, 539 A.2d 657. That assertion invaded the province of the jury. "Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination." *Id.* at 277, 539 A.2d 657 (quoting *Mutyambizi v. State,* 33 Md.App. 55, 61, 363 A.2d 511 (1976)); *see also* J.F. Murphy, Jr., MARYLAND EVIDENCE HANDBOOK § 603(C), at 250 (3d ed.1999) (stating that a witness is not permitted "to express an opinion that another person's specific testimony is true or false").

In *Blair v. State,* 130 Md.App. 571, 747 A.2d 702 (2000), John Fleig was the State's key witness implicating defendant Blair in a murder. The defense impeached Fleig's trial testimony with inconsistent statements he had made in connection with a plea agreement at an earlier trial of a confederate. The State then called Fleig's attorney to the stand. The attorney testified that he had discussed the murder on several occasions with Fleig prior to the plea agreement and the trial of the confederate. He then stated, conclusorily, that Fleig's statement to him during those meetings was consistent with what Fleig said during the plea agreement and Fleig's testimony at his confederate's trial.

We ruled that this was error because the jury was not aware of the statements Fleig made to his attorney. "In essence, the jury was offered an opinion by one State's witness that another State's witness said the same thing on three different prior occasions." *Id.* at 597, 747 A.2d 702. The error was prejudicial, so we reversed the conviction. *See id.* at 614, 747 A.2d 702.

 *Blair* does not control the outcome here. There is a similarity to *Blair,* in that Detective Dominick's testimony was solicited to bolster another witness's credibility, and her statement regarding the consistency of the victim's statements was not admissible. But the detective's single statement that she found nothing inconsistent in the victim's recounting of the crimes to her was a far cry from the lengthy and detailed statements by the attorney testifying in *Blair. See id.* at 597, 747 A.2d 702.

Moreover, we must consider the admission of the detective's testimony, along with the hours of damning testimony that the jury heard from Kimberly, the evidence it saw of her injuries, which were consistent with rape, and the reports it learned about linking Robinson's DNA to the victim. We note further that Robinson cross-examined the victim and other State witnesses thoroughly and vigorously, exposing several inconsistencies and lacunae in the State's case.

We are persuaded beyond a reasonable doubt that the detective's opinion about the consistency of the victim's out-of-court statements to her could not have influenced the jury's decision. *See Dorsey,* 276 Md. at 659, 350 A.2d 665. Were we to reverse on such an error, we would be invading the province of the jury.

## III.

Next, Robinson argues that the trial court abused its discretion in refusing to hold a hearing to determine whether the DNA testing that Cellmark Laboratory did in this case was valid under Maryland Code (2002), Courts and Judicial Pro-

ceedings Article, section 10–915. His argument is without merit.

Section 10–915, titled "Admissibility of DNA profiles," includes a definitional section and an admissibility section. The definitional section provides:

(2) "Deoxyribonucleic acid (DNA)" means the molecules in all cellular forms that contain genetic information in a chemical structure of each individual. (3) "DNA profile" means an analysis of genetic loci that have validated according to standards established by: (i) The Technical Working Group on DNA Analysis Methods (TWGDAM); or (ii) The DNA Advisory Board of the Federal Bureau of Investigation.

The admissibility section provides:

(b) In general.—A statement from the testing laboratory setting forth that the analysis of genetic loci has been validated by standards established by TWGDAM or the DNA Advisory Board is sufficient to admit a DNA profile under this section.

Prior to trial, Robinson filed a motion *in limine* to preclude admission of the DNA testing results until the court conducted a hearing to verify that those tests had been approved by the entities identified in the statute. The State responded with a copy of a letter from Cellmark that the tests had been so validated. After hearing argument from both sides, the court denied the motion with the explanation that "[t]he accuracy of [Cellmark's] statement [of approval] is something that can be challenged at trial before the jury, and it could be something for the jury to consider or the court to consider—one of the other—at the trial."

When interpreting a statute, "[t]he paramount object ... is the ascertainment and effectuation of the real intention of the Legislature." *Blind Indus. and Servs. of Md. v. Md. Dep't of Gen. Servs.*, 371 Md. 221, 231, 808 A.2d 782 (2002) (citations omitted). As always, "we start our search for legislative intent with the words of the statute being con-

strued." *Id.* Unless the Legislature intended otherwise, we give words their commonly understood meaning. *Id.*

■ The statute clearly provides that if the DNA testing meets the standard requirements of the TWGDAM or the DNA Advisory Board, the evidence is admissible. The State provided a letter from Cellmark, on Cellmark letterhead, which asserted that the tests it conducted met the prescribed statutory requirements. We perceive no error by the trial court in denying Robinson's request for a hearing to determine what the letter so clearly documented.

## IV.

Robinson also argues that the trial court erred when it admitted the DNA report generated by Cellmark under the business record exception to the hearsay rule. He asserts that the report was untrustworthy because it was generated in anticipation of litigation. Robinson also argues that, to the extent that the DNA report was consistent with the analyst's trial testimony, it constituted cumulative evidence.

■ The short answer to Robinson's argument is that, even if the trial court erred in admitting the report under the business record exception, the error was harmless. *See Dorsey,* 276 Md. at 659, 350 A.2d 665. Robinson did not dispute that he had vaginal and anal intercourse with the victim; he argued that the intercourse was consensual. Thus, a report that stated Robinson's DNA was found in the victim's vagina and that there was sperm found in the victim's anus was of no prejudice to Robinson, and any error in the report's admission would have been harmless beyond a reasonable doubt.

## V.

Lastly, Robinson argues that there was insufficient evidence of force to support the rape and assault convictions stemming from the March 10th incident. He writes in his brief that, "[d]espite [the victim's] testimony that appellant 'raped' her, she gave no testimony that there was any force or threat of force in connection with [the] second encounter." We disagree.

The function of the trial court is not to weigh the persuasive effect of the evidence, but only to ensure that there is enough evidence to present to the fact-finder. *See Hebron v. State,* 331 Md. 219, 235, 627 A.2d 1029 (1993). Our task is akin to the trial court when reviewing sufficiency challenges. We read the testimony and exhibits presented to the trial court in a light most favorable to the State, and we will affirm the judgment as long as a rational trier of fact could have found each element of the crime beyond a reasonable doubt. *Thomas v. State,* 143 Md.App. 97, 121, 792 A.2d 368, *cert. denied,* 369 Md. 573, 801 A.2d 1033 (2002).

Regarding the force element of sexual assaults, the Court of Appeals has stated:

Force is an essential element of the crime [of rape] and to justify a conviction, the evidence must warrant a conclusion either that the victim resisted and her resistance was overcome by force or that she was prevented from resisting by threats to her safety. But no particular amount of force, either actual or constructive, is required to constitute rape. Necessarily that fact must depend upon the prevailing circumstances. As in this case force may exist without violence. If the acts and threats of the defendant were reasonably calculated to create in the mind of the victim—having regard to the circumstances in which she was placed—a real apprehension, due to fear, of imminent bodily harm, serious enough to impair or overcome her will to resist, then such acts and threats are the equivalent of force.

*State v. Rusk,* 289 Md. 230, 242, 424 A.2d 720 (1981) (citation omitted). Moreover,

[j]ust where persuasion ends and force begins in cases like the present is essentially a factual issue, to be resolved in light of the controlling legal precepts. That "threats of force need not be made in any particular manner in order to put a person in fear of bodily harm is well established. *Id.* at 246, 424 A.2d 720.

Thus, the perpetrator's creation of certain conditions may, depending on the circumstances, make unnecessary the

need for outward expressions of force. *See id.* at 240–43, 424 A.2d 720; *Martin v. State,* 113 Md.App. 190, 244–50, 686 A.2d 1130 (1996). Nonetheless, this Court has recognized that, because of the "myriad ... circumstances that can arise, the reasonableness of a victim's non-resistance is usually best left to the fact-finder." *Martin,* 113 Md.App. at 247, 686 A.2d 1130.

■■■ The victim testified that, during the second assault, Robinson forced her to engage in vaginal and anal intercourse. She cried, told him to stop, and told him he was hurting her. On cross-examination, she testified that she started to scream and that Robinson "said that if I didn't stop screaming, he would hurt me." Given the law as stated above and our standard of review on appeal, this testimony was sufficient to establish the element of force to sustain Robinson's convictions.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED; APPELLANT TO PAY COSTS.**