11 A.3d 824

**Donte Lamont TYNER and Tavon Berson Tyner**

v.

**STATE of Maryland.**

No. 51, Sept. Term, 2010.

Court of Appeals of Maryland.

Jan. 21, 2011.

Michael R. Braudes, Asst. Public Defender (Paul B. De-Wolfe, Public Defender, Baltimore, MD), on brief, for petitioners.

Diane E. Keller, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen. of Maryland, Baltimore, MD), on brief, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, MURPHY, ADKINS and BARBERA, JJ.

HARRELL, J.

On an early Fall evening in 2006, seventeen bullets struck Darrell Artist ("Artist"), a young man congregating at the time with others near 7180 McClean Boulevard, Baltimore City, Maryland. He died from the wounds. Two brothers, Donte Tyner ("Donte") and Tavon Tyner ("Tavon"),[1] were found by a jury in the Circuit Court for Baltimore City criminally responsible for his murder. Their joint trial produced the evidentiary questions before us in this case.

I.

At trial, a number of facts were elicited by the State from multiple witnesses. We recount only those facts necessary to supply context for the resolution of the questions we consider here.

On 7 September 2006, an outdoor gathering of people (including Artist, Donte, and Tavon) in a parking lot adjacent to apartments in the Dutch Village area of Baltimore were listening to rap music on a "boom box" and singing along. At some point, Donte and Artist threw punches at each other. Moments later, shots were fired. Seventeen bullets struck Artist, leaving him mortally wounded. Baltimore City police recovered two different types of ammunition (9 millimeter and .40 caliber) from his body and at the crime scene, leading the police to believe that there were two gunmen.

After the shooting, Donte, Tavon, and others got into a van and a car, and fled—Donte in the car and Tavon in the van. The van was driven by Latosca McCullough ("McCullough"). The two vehicles were driven to the house of Troy Brown, one of the individuals in the van.

A few days later, the police caught up with McCullough while she was at Mr. Brown's house. They asked her about her van, which was parked in Brown's driveway. She ac-

---

1. We shall use their first names to distinguish them for clarity purposes.

knowledged that she owned the vehicle; whereupon, she was arrested and taken to the Homicide Unit for questioning.

Once there, she told Detective Irvin Bradley that she was not present at the shooting on the 7th and knew nothing about it. Although McCullough was charged initially with murder, she struck a deal eventually with the State's Attorney's Office for Baltimore City, after she obtained counsel. In exchange for her truthful testimony, the State agreed to drop the murder charge.

Deal in hand, McCullough shared with Detective Bradley a different story of Artist's shooting and the Tyners' alleged involvement than originally told. She claimed that, while others were listening to music and singing, she remained in her van. After Donte and Artist began fighting, she heard various "pops" and a "boom." Looking toward the direction of those sounds, she saw Tavon standing next to her van with "sparks coming from his hand." Tavon then got into the van and ordered her to "pull off," remarking "that [African–American] is gone from around here."

Arriving at Brown's house, Donte and Tavon instructed McCullough to feign ignorance, when confronted by the police, of what transpired that day on McClean Boulevard. Specifically, they allegedly told McCullough to say she was not at the crime scene and that she saw the brothers only earlier that day. McCullough complied with the directions (until she made her deal with the State) because she proclaimed that she feared for her life.

Ultimately, Donte and Tavon were arrested in connection with Artist's death and charged with first-degree murder, conspiracy to commit murder, use of a handgun in a crime of violence, and lesser related offenses. A nine-day jury trial in the Circuit Court for Baltimore City resulted in their conviction on all charges. Significant at trial, in addition to McCullough's testimony, was the testimony of another eyewitness, Miha Brown, who was sixteen at the time of the shooting and observed the incident from her second-story bedroom window. After the shooting, police showed Brown three, separate ar-

rays of photographs, each containing six persons with similar likenesses. Police informed Brown that the photo arrays may not contain any of the individuals suspected in the crime. Nonetheless, Brown selected (and noted in her handwriting on the photographs of them) that McCullough was the driver of the van, Donte the person who "sho[t] and kill[ed]" Artist, and Tavon "the person who did the murder."

On 11 August 2008, the trial judge denied Petitioners' motion for a new trial and imposed on each defendant a life sentence for first-degree murder, concurrent life sentence for conspiracy to commit murder, and twenty-year sentence for use of a handgun in a crime of violence. Petitioners appealed to the Court of Special Appeals, arguing, among other things, that Detective Bradley had been allowed to opine, improperly and prejudicially, regarding the truthfulness of McCullough's trial testimony. In an unreported opinion, the intermediate appellate court affirmed, finding that:

> [I]n context, [Bradley's testimony] was offered not as [his] opinion that McCullough was truthful, but to explain that, after initially denying that she was at the scene of the murder and being charged with the crime, she gave the statement that included admission that she saw Tavon firing a gun.

We issued a writ of certiorari on the Tyners' petition, *Tyner v. State*, 415 Md. 41, 997 A.2d 791 (2010), to consider the following questions:

> (1) Did the trial court err in refusing to strike the testimony of a detective ... [regarding another witness who] initially stated she was not present at the crime scene but subsequently provided a statement inculpating petitioners?

> (2) Where two defendants with identical interests are jointly tried and one objects to evidence equally damaging to both, should the objection be deemed to preserve the issue as to both?

For reasons we shall explain, we hold that the trial court did not err by refusing to strike Detective Bradley's testimony.

As a consequence of this determination, we need not answer the second question.

## II.

The parties' briefs and arguments focus on whether the trial judge abused his discretion in refusing to strike specific portions of Detective Bradley's testimony. The proper question is actually whether the trial judge erred, *as a matter of law,* by allowing testimony "relating to the credibility of another witness" to be considered by the jury. *Bohnert v. State,* 312 Md. 266, 278, 539 A.2d 657, 663 (1988).

## III.

Petitioners characterize Detective Bradley's pertinent testimony (the last witness called by the State in its case-in-chief) as asserting that McCullough should be trusted because—in his opinion as a twenty-nine year veteran of the police force—she was telling the truth. Such bolstering testimony, they claim, should have been struck as violative of *Bohnert* and *Hunter.*

In *Bohnert,* a child accused the defendant of sexual abuse. *See Bohnert,* 312 Md. at 268, 539 A.2d at 658. The State offered no physical evidence inculpating Bohnert. *See Bohnert,* 312 Md. at 270, 539 A.2d at 659. The State produced as a witness, however, a Protective Service Investigator with the Department of Social Services, *i.e.,* a social worker named Dora Temple. *See Bohnert,* 312 Md. at 270–71, 539 A.2d at 659. After questioning extensively Temple about her credentials, the State offered—and the trial court accepted—her as "an expert in the field of child sexual abuse." *Bohnert,* 312 Md. at 271, 539 A.2d at 659. Although Temple conducted a less-than-thorough examination of the child victim, she concluded nonetheless that the child "was, in fact, a victim of sexual abuse." *Id.* The defendant took the stand and denied the charges. *See Bohnert,* 312 Md. at 270, 273, 539 A.2d at 659, 660.

In its closing argument, the State emphasized repeatedly that Temple was an expert, her testimony was uncontroverted, and she corroborated the child's allegations. In particular, the prosecutor told the jury that:

> You have an expert opinion in this case [that] this child was sexually abused. It's unrefuted, not disputed, not contradicted and you have [the child's] testimony about what happened and how it happened and you have her testimony ... about who did it. There's no question about who did it and I ask you to find verdicts of guilty on all counts.

*Bohnert,* 312 Md. at 273–74, 539 A.2d at 660–61.

We acknowledged that, because of the lack of physical evidence, the child's "credibility was crucial." *Bohnert,* 312 Md. at 270, 539 A.2d at 659. Thus, "[*i* ]*n the circumstances of this case,*" the State used intentionally Temple's testimony to bolster improperly and prejudicially the child's allegations. *Bohnert,* 312 Md. at 277, 539 A.2d at 662 (emphasis added). Accordingly, the trial court should have prevented Temple's testimony from being considered by the jury. *See id.*[2]

We noted that such bolstering testimony is irrelevant and, therefore, violative of Maryland Rule 5–402.[3] *See id.* ("Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant ....") (internal quotation marks and citations omitted). We concluded, as relevant for present purposes, however, not that the trial judge abused his discretion, which would have been the proper standard if relevancy was the ultimate issue, *see Merzbacher v. State,* 346 Md. 391, 404–405, 697 A.2d 432, 439 (1997) (stating that appellate courts are "generally loath to reverse a trial court['s relevancy determination] unless ... there is a

---

**2.** We held that Temple's testimony in *Bohnert* was inadmissible for an additional reason—Temple's opinion "was not based on facts sufficient to form a basis for her opinion"; therefore, "admitting the opinion ... evidence was an abuse of discretion." *Bohnert,* 312 Md. at 276–77, 539 A.2d at 662.

**3.** Maryland Rule 5–402 states, in pertinent part, that "[e]vidence that is not relevant is not admissible."

clear showing of an abuse of discretion"), but rather that "[i]t is ... *error,*" as a *"matter of law,"* "for the [trial] court to permit to go to the jury a statement, belief, or opinion of another person to the effect that a witness is telling the truth or lying." *Bohnert,* 312 Md. at 277, 279, 539 A.2d at 662, 663 (emphasis added). In particular, we determined that:

> [Temple's] opinion was inadmissible as a matter of law because .... [i]t encroached on the jury's function to judge the credibility of the witnesses and weigh their testimony.... In ruling on a question of law[,] a judge is either right or wrong, and discretion plays no part. In this case[, the trial judge] was wrong.

*Id.; see also Crawford v. State,* 285 Md. 431, 451, 404 A.2d 244, 254 (1979) (finding error where the jury heard a recorded interrogation in which police expressed disbelief of the defendant's story).

*Hunter* also is relied on by Petitioners. There, the defendant was charged with first-degree burglary. *See Hunter,* 397 Md. at 583, 919 A.2d at 64. He elected to testify in his defense; whereupon, the prosecutor asked "were-they-lying" questions about the State's police witnesses, *i.e.,* the prosecutor cornered the defendant into acknowledging that, in the defendant's opinion, the police were lying. *Hunter,* 397 Md. at 589, 919 A.2d at 68. "These questions," we held, "were impermissible *as a matter of law* because they encroached on the province of the jury by asking petitioner to judge the credibility of the detectives and weigh their testimony...." *Hunter,* 397 Md. at 595, 919 A.2d at 72 (emphasis added).

## IV.

In light of *Bohnert* and *Hunter,* to resolve the present case we must consider not only precisely what the focal testimony was at trial, but also the context in which it was used. Before Detective Bradley made the remarks which gave rise to the defense objections at issue here, McCullough, consistent with her final investigatory statements to police (but inconsistent with her previous statements before she was charged), testi-

fied that she heard "pops" and witnessed "sparks" coming from Tavon's hand. She also testified that, after the shooting, Donte and Tavon instructed her to lie to the police and assured her that, if she followed through as directed, she would not be charged with anything.[4]

In direct examination, the following exchange took place at the trial:

[Prosecutor]: And do you remember making an agreement with the State?

[McCullough]: Yes.

[Prosecutor]: And what was the agreement that you made with the State?

[McCullough]: Umm, to tell the truth.

[Prosecutor]: And what would happen if you came here and told the truth?

[McCullough]: That my charges would be dropped.

[Prosecutor]: What charges, all of your charges?

[McCullough]: Yes.

With its last witness in its case-in-chief, Detective Bradley, the State took the opportunity to summarize the case against the Tyner brothers. Over fifty-one pages of direct examination, Detective Bradley reiterated the chronological process of the investigation. Eventually, Detective Bradley was asked about his interactions with McCullough. He testified that, at first, when McCullough was arrested and brought in for questioning, she "reported not being at the scene." After the interview, McCullough was charged with first-degree murder. Subsequently, McCullough retained the assistance of counsel, struck an agreement with the State, and changed her recounting of the events. As Detective Bradley explained:

[Prosecutor]: And did there come a time when you were present and [McCullough] gave a taped statement?

---

4. As explained, *infra* footnote 5, defense counsel were allowed and did seek to impeach McCullough's trial testimony with her prior inconsistent statement and the deal.

[Bradley]: Yes, sir.

[Prosecutor]: And what was your understanding as to why she was giving that taped statement?

[Tavon's counsel]: Objection.

[The Court]: Overruled.

[Bradley]: She was giving the taped statement to tell the truth.

[Tavon's counsel]: Objection. Move to strike.

[The Court]: Overruled and denied.

[Prosecutor]: In reference to what?

[Bradley]: In reference to the murder of Darrell Artist and who was involved.

[Prosecutor]: Well if you know, did she have an agreement with the State?

[Bradley]: I believe so. Yes, sir.

[Prosecutor]: And when you say to tell the truth, what was that in reference to?

[Tavon's counsel]: Objection.

[The Court]: Overruled.

[Bradley]: To tell the truth as to what happened on that night that [Artist] was shot and killed, who was involved and umm, the people that was involved and what happened after the murder and, and up until I picked her up.

[Prosecutor]: And if you know, was that part of her agreement with the State?

[Bradley]: Yes, sir.

During its closing argument, the State did not assert that McCullough's testimony should be trusted because Detective Bradley said so. Rather, the State said simply that "[McCullough] entered an agreement with the State, a Cooperation Agreement to tell the truth. It's up to you to judge whether or not she did that."

Was the trial judge right or wrong in admitting Detective Bradley's testimony over Tavon's counsel's objections? Considering not only the content, but also the *context* of Detective

Bradley's remarks, we cannot say that the trial judge erred as a matter of law.

It is not uncommon for the State to use its final witness in its case-in-chief, as it did here, to summarize the State's case for the jury's benefit. The State's case was grounded, at least in part, on McCullough's ultimate recollection of the murder. In addition to offering McCullough's fact testimony for the jury's consideration, however, the State decided to confront the "elephant in the room," that McCullough could be (and likely would be) characterized as, at least, a "turncoat" witness by the defense. It confronted the situation with not only questions of McCullough, but also Detective Bradley.

To explain why McCullough changed her story over the course of the police investigation, the State elicited the fact that it struck a cooperation agreement with McCullough. It was not illogical or violative of any rule or legal principle for the State to elicit the terms of that agreement. Such information, by whomever adduced, might help a jury determine what weight it should accord the witness's testimony.[5] In the present case, the cooperation agreement's main, if not only, condition was that McCullough testify truthfully. That Detective Bradley acknowledged this fact is not impermissible bolstering or vouching; it was simply a recounting. Indeed, Detective Bradley did not confirm, as the expert witness did in *Bohnert*, a lay witness's first-hand allegations. Nor did he opine, as the defendant did in *Hunter*, on other witnesses' credibility. In other words, Detective Bradley did not state that what another witness responded was accurate or truthful,

---

5. Hoping to take the sting out of something that one knows the other side undoubtedly will probe is a well understood trial tactic. In the present case, notwithstanding the fact that the cooperation agreement was discussed preemptively in McCullough's direct examination, Tavon's trial counsel challenged McCullough's motives and questioned her trustworthiness on cross-examination, asking, among other things, "What did you want out of [the] meeting [with the State's Attorney's Office]?"; "Did you want the charges dropped against you?"; "Did you tell the State's Attorney that you wanted to get out of jail and have the charges dropped against you?"; and "[h]ow soon after making this statement did you get out of jail?"

only that the witness *had an obligation*, pursuant to a cooperation agreement, to state truthfully what occurred. Whether McCullough was truthful remained for the jury to decide, unvarnished by impermissible advisory opinions.

In sum, the State's direct examination of Detective Bradley involved not the substance of McCullough's taped statement, but the context in which it was given (*i.e.*, McCullough's motives). The prosecutor elicited only from Detective Bradley "why" McCullough gave the taped statement and whether "tell[ing] the truth" was part of that agreement. Stated differently, the State used Detective Bradley to verify the existence and terms of a cooperation agreement entered into by one of its key witnesses. Therefore, *in these circumstances*, Detective Bradley's testimony did not infringe upon the jury's fact-finding obligation.

As we do not find error in the trial court's decision to admit Detective Bradley's testimony regarding McCullough's cooperation agreement, we do not reach the issue of whether an objection by one co-defendant may be relied upon on appeal by a non-objecting co-defendant.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE SHARED EQUALLY BY PETITIONERS.**