**REPORTED**

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No.  415

September Term, 2014

_____

RICKY HORTON

v.

STATE OF MARYLAND

---

Meredith,
Woodward,
Wright,

JJ.

---

Opinion by Meredith, J.

---

Filed: January 28, 2016

Following a jury trial in the Circuit Court for Baltimore City, Ricky Horton, appellant, was found guilty of a number of charges arising from two separate shooting incidents that took place on January 13, 2013. He was sentenced to two consecutive life terms, plus ninety years. In this appeal, appellant challenges two evidentiary rulings. He also asserts that the trial judge erred in failing to give one of his requested jury instructions, and erred in considering impermissible matters when imposing the sentences.

## QUESTIONS PRESENTED

On appeal, appellant asks this Court to review the following questions, which we have reordered:

1. Did the trial court err in allowing into evidence Tia Grannison's prior consistent statement?

2. Did the trial court err in allowing the prosecutor to impermissibly cross-examine appellant?

3. Did the trial court err in refusing to propound a jury instruction on the testimony of an accomplice?

4. Did the trial court rely on an impermissible sentencing consideration?

For the reasons stated herein, we perceive no reversible error, and affirm the judgments of the Circuit Court for Baltimore City.

## FACTS AND PROCEDURAL HISTORY

In the early morning hours of January 13, 2013, two couples — Sean Rhodes and his girlfriend, Shanelle Hopkins, along with Rudy Hyman and his girlfriend, Joy Darden — were at an after-hours club in Baltimore City called 007s. When the group left that club, they went to another after-hours club on North Avenue called Rasta's.

This foursome was unaware that they had been noticed by the appellant and his group while they were at 007s. Appellant was also visiting clubs during the early morning in question. Appellant's group included some unnamed associates and Tia Grannison, a woman with whom he had a relationship. According to the testimony of Grannison, appellant spotted Sean Rhodes at 007s and expressed his belief that Rhodes had, at some earlier time, shot one of appellant's friends.

Appellant and his group followed Sean Rhodes's group to Rasta's. When the Rhodes group left Rasta's, appellant walked up to Rhodes as he was getting into his car, and shot him in the head at close range. Rudy Hyman stepped in front of his sister — Shanelle Hopkins — and Hyman was then also shot.

The evidence reflected that, at the time of the shootings, Tia Grannison and another associate of appellant's were sitting in the car her group had taken to Rasta's. After the shots were fired, appellant ran back to the car. Grannison shouted to her co-occupant: "open the door," and appellant and his friend then entered the back seat of the car, with Grannison seated in the middle of them. The car traveled a few blocks, and stopped in an alley. Appellant ordered everyone out of the car. Appellant announced: "If you are not a Blood then you've got to die." He then shot Grannison in the stomach and face. She played dead, and he fled. But she lived, and testified for the prosecution at appellant's trial.

Grannison testified that, on January 13, 2013, she went to 007s with the appellant, whom she knew as "Purple." She and appellant had known each other for "a month or two,"

and had a relationship she described as "friendly" and "somewhat" romantic.  Once they arrived at 007s, appellant met up with some of his friends, whose names Grannison once knew but she claimed to have forgotten by the time of trial.  Grannison first saw Sean Rhodes outside of 007s, while she was sitting in a car with appellant and his friends.  She heard appellant say that Sean Rhodes had shot appellant's friend, and appellant said he wanted to shoot Sean Rhodes.

Appellant and his group followed the Rhodes group to Rasta's.  Appellant drove and parked around the corner from the club.  Appellant and one of his friends got out of the car.  Grannison described what happened next:

Q. [BY THE STATE]:  Did you hear any gunshots?

A. [BY TIA GRANNISON]:  Yes.

Q.      Do you know how many?

A.      No.

Q.      What, if anything, happened next?

A.      Then they came back to the car.

Q.      Who's they?

A.      Purple and his friend.

Q.      And then what happened?

A.      He got in the back seat and the other boy got in the other side.

Q.      And where were you seated?

3

A.   In the middle.

Q.   And then what, if anything, happened?

A.   And then they pulled off.

Q.   Do you know where they went?

A.   I'm not sure of the street name.

Q.   Did it take a while to get there, if you know?

A.   No.

Q.   Then what happened?

A.   Then he said, Come on.  Everybody go get in my car.

Q.   Whose car was he referring to, if you know?

A.   His car, Purple's car.

Q.   The car that he came to North Avenue with was not his car?

A.   No.

Q.   And then what happened?

A.   He waited until they pulled off and then —

Q.   Are you all right?

A.   Mm-hmm.  He waited until they pulled off and he said, if you're not —

Q.   Did you get out?

A.   Yeah.

Q.   Who got out with you?

4

A.     Purple and this other boy.

                                    * * *

Q.     Ms. Grannison, can you just tell us what you heard from Purple?

A.     He said, um, leave no witnesses to the scene if you're not a Blood.  If you're not a Blood then you've got to die.

Q.     And then what happened?

A.     And then he shot me.

Q.     Where did he shoot you?

A.     In my stomach and my face.

Q.     Is that all?  What happened next?

A.     I mean, he was going to shoot me again, but I guess the gun got jammed —

[BY APPELLANT'S COUNSEL]:  Objection.

[BY THE COURT]:  Overruled.

[BY TIA GRANNISON]:   — and — the gun got jammed and he ran.  I laid there like I was dead.  I got up and ran the other way.  I ran on somebody's door and I fell on their, I fell in their doorway.

[BY THE STATE]:  And then what happened?

A.     I don't remember.

Q.     Do you remember telling anybody at the hospital who did this to you?

A.     I think it was the police.

Q.     And what did you say?

5

[BY APPELLANT'S COUNSEL]: Objection.

[BY THE COURT]: Overruled.

[BY TIA GRANNISON]: I told them Purple shot me.

Grannison identified appellant as her assailant when the police interviewed her at the hospital on January 16. Although her jaw was wired shut and she could not speak, she was able to put an "X" next to appellant's photo in a photo array presented to her by detectives. On February 6, after her discharge from Shock Trauma, she gave police a recorded statement identifying appellant as the person who shot her. She also identified him in open court, and pointed him out for the jury in surveillance video from a local business. Grannison was consistent in stating that appellant was the person who shot her.

Appellant testified in his defense at trial. He agreed that he had been in a group partying and clubbing that night, and that he had been at 007s and Rasta's. He agreed that it was him depicted in the surveillance footage from which Grannison identified him. But he denied knowing Sean Rhodes or Rudy Hyman, and claimed that, when they were shot, he was standing on the sidewalk, smoking a cigarette. He testified that he heard the gunshots and ran back to the car where Grannison was waiting. He also claimed to know nothing about how Tia Grannison ended up getting shot. He gave this account of what took place when he and his group were outside Rasta's, near the intersection of North Avenue and Smallwood Street:

[BY APPELLANT]: I was standing on North Avenue and Smallwood Bottle Bar [sic], smoking a cigarette, taking a cigarette break and I heard gun shots.

6

And when I heard gun shots I got scared and I ran to the car and jumped in the car.

* * *

Me and my friend, we ran back to the car and we jumped in the car. And then we left. And as I left, as we left it was just enough for me that night, it was just too much that night, gun shots, partying and all that, and I wanted to leave and I just told dudes to drop me off where my car was at, and that's where I got dropped off and I left. And I left Tia with them guys because Tia wanted to, basically they was going to give Tia a ride home.

The jury convicted appellant of first-degree murder of Sean Rhodes; using a firearm in the commission of a crime of violence; wearing, carrying, or transporting a handgun; conspiracy to murder Sean Rhodes; first-degree assault of Rudy Hyman; using a firearm in the commission of that crime; wearing, carrying, or transporting a handgun, as to the assault on Mr. Hyman; attempted murder of Tia Grannison; using a firearm in the commission of that crime; and wearing, carrying, or transporting a firearm in the commission of that crime. It had also been stipulated that appellant was prohibited from being in possession of a firearm, and he was found guilty of being a prohibited person in possession.

On April 14, 2014, the court sentenced appellant to two consecutive life sentences, plus ninety years. This appeal followed.

**DISCUSSION**

**I.    Tia Grannison's prior consistent statement**

Appellant contends that the trial court erred in permitting the prosecutor to play for the jury a recording of the investigating officers' February 6 interview of Tia Grannison. The

7

recording was played, over appellant's objection, during the State's redirect examination of Grannison. Leading up to the trial court's ruling that the recording could be played, the following transpired.

On direct examination during the State's case, Tia Grannison testified to the following: she was with her friend "Purple" — *i.e.*, appellant — during the early morning hours of January 13; some friends of Purple's whose names she did not recall at the time of trial were also with them; she overheard Purple say that Sean Rhodes had shot Purple's friend, and Purple therefore wanted to shoot Sean Rhodes; the whole group with Purple followed Sean Rhodes's group to Rasta's, and Purple and one of his friends then exited the car; she then heard gunshots; Purple and his friend ran to, and reentered, the car; the group then drove to an alley; the other men left; Purple turned to Grannison and said, "Leave no witnesses to the scene if you're not a Blood. If you're not a Blood then you've got to die"; and Purple then shot her in the face and stomach and ran away.

She testified that she was interviewed by police on January 16, while she was still in the hospital with her jaw wired shut. She was nevertheless able to identify appellant from a photo array on that date. The photo array procedure was videotaped, and the videotape and the photo array were both admitted into evidence, without objection. The State also played surveillance video from a business near the shootings of Rhodes and Hyman, and Grannison pointed out for the jury the vehicle in which she and Purple and his friends arrived at Rasta's,

8

and, in a later clip, she pointed out appellant falling down trying to get back in the car after she heard gunshots.

Appellant's counsel began cross-examination by questioning Ms. Grannison about the recorded statement she gave police on February 6 — the same statement which he argues on appeal, should not have been admitted into evidence.[1] Appellant's cross-examination included questions that suggested Grannison was not telling the complete truth about the extent of her prior knowledge of, and participation in, the shootings of Sean Rhodes and Rudy Hyman. The questions suggested that she was not being totally forthcoming regarding the identities of appellant's associates who were present on the evening of the shooting, and further suggested that, in light of the fact that she had never been charged with any crime, Grannison may have been promised some deal in return for her testimony against appellant. A representative excerpt of the cross-examination of Grannison is as follows:

> [BY APPELLANT'S COUNSEL]: All right. Ma'am, you were interviewed by Detective Robert Ross on February 7, 2013, [sic] correct?
>
> [BY TIA GRANNISON]: Yes.
>
> Q. And your memory was better at that time, when it was closer to the incident, wasn't it?
>
> A. Yes.

---

[1]Although counsel's line of inquiry began with him asking Ms. Grannison about her interview with police on "February 7, 2013," it was later made clear, in a colloquy with the court, that the statement at issue was given on February 6 and there was no February 7 statement.

Q. Ma'am, isn't it true that at the time you gave the statement to Detective Ross you said you never saw Purple shoot anybody?

A. Yes, I said I didn't see him shoot anybody.

Q. Okay. So then what you said on direct examination, that you saw Purple shoot the guy is not true, correct?

[BY THE STATE]: Objection.

[BY TIA GRANNISON]: I didn't say that.[2]

[BY THE COURT]: That's answered.

[BY APPELLANT'S COUNSEL]: You said Purple shot him, right?

[BY TIA GRANNISON]: Yes.

Q. You didn't see him shoot him, correct?

A. Mm-hmm.

* * *

Q. So you were parked, actually, around the corner from where Rasta's was, correct?

A. Yes.

Q. All right, and then the person that we see running back to the car and slipping, that you say is Purple, that's at 5:51, correct?

A. Yes.

Q. Okay. So between 5:26 and 5:51 the car had turned around and you were sitting in the car, right?

---

[2]Ms. Grannison did not testify on direct that she **saw** Purple shoot anybody other than herself.

10

A. Yes.

Q. And it was you and one other boy, correct?

A. And there was another boy in the front.

Q. Okay so there were two in the car with you and two had gotten out, correct?

A. Yes.

Q. And there was also another car that was with you, isn't that correct? That's what you told Detective Ross?

A. Yes.

Q. You told Detective Ross there was another car, and that was the car that was behind you, right?

A. I think —

Q. You have to answer.

A. I think so.

Q. Okay. And, in fact, there was a third car, isn't that correct? The one that was parked across the street, on the corner?

A. The little gold car?

Q. The little gold car.

A. I'm not sure if it was with us.

Q. Okay, well, what time did you leave 007s?

A. I'm not sure what time it was.

Q. Okay, but you were there partying that night, right?

11

A.    Yes.

Q.    And you say you were with Purple and his friends, correct?

A.    Yes.

Q.    And you had hung out with Purple before?

A.    Yes.

Q.    And you knew his friends, correct?

A.    Yeah, but I didn't know their names.  I mean, I forgot their names.

Q.    But you knew them by their street names, correct?

A.    I forgot.

Q.    You forgot?  Okay.  So sitting in court today you forgot who those people were?

A.    No, I've forgot their names.

Q.    So you were never asked who any of the other individuals were in the car that you were in, which included Purple and three other guys, correct?

A.    Mm-hmm.

* * *

Q.    All right, and you remember Detective Ross asking you, on February [6]th, if you knew any of the other boys?

* * *

And, Ms. Grannison, when Detective Ross asked you about who the other boys were in the car or involved with this, you didn't know, is that correct?

12

A. Yes.

* * *

Q. Ma'am, did you — were you ever asked — did you ever point out anybody else, or did you ever identify anybody else who was in your group?

A. Yeah, I think I did. I don't remember though.

Q. Okay.

A. I don't remember. **I just remember Purple because he's the one that shot me.**

Q. Would it surprise you that in your statement, that was recorded with Detective Ross, that you never said that Purple said he was going to shoot this guys [sic], it was always they said they were going to shoot this guy?

A. It was like — say that again?

Q. In your recorded statement to Detective Ross, isn't it true that you always said, they said they said they were going to shoot this guy?

A. Mm-hmm.

Q. Is that a yes?

A. Yes.

Q. You never said that Purple said he was going to shoot this guy, isn't that right?

A. Because when we was in the car —

Q. Ma'am, that's a yes or no question.

[BY THE STATE]: Objection.

13

[BY THE COURT]:  Well let her answer the question, Counsel.

[BY TIA GRANNISON]:  I can answer?

[BY THE COURT]:  You can answer the question, yes, ma'am.

[BY TIA GRANNISON]:  When we was in the car, it was like — they was like, we're going to shoot this guy.  Purple —

[BY APPELLANT'S COUNSEL]:  So what did you think you were getting in the car to do?

* * *

Ms. Grannison, what did you think you were getting in the car to go — where did you think you were going when you got into the car after 007's?

A.     I don't know, because when we always leave the club — go ahead and go or something.

Q.     I'm sorry, what was that?

[BY THE COURT]:  I'm sorry, say it again, ma'am. We can't understand —

A.     I said, we used to go hang out.

Q.     Okay.  Didn't you testify on direct examination that they were talking about shooting this man, isn't that correct?

A.     Yes.

Q.     And then you got into a car and went there?

A.     No, but I didn't know until —

Q.     Correct me then.  You didn't know that they were going to — they weren't talking about that beforehand?

A.     When they was in the — when he was leaving out — I mean, his friend grabbed me and said, come on.  We gotta go.  I was like, where Purple?

14

He's in the car. So when we got in the car, then they started talking about it.

Q. Okay. Do you remember saying that you were scared —

A. Yes.

Q. — when you were in the car?

A. Yes.

Q. But you told the detective that you were okay because you were with Purple, right?

A. I said that because when I said I was scared, Purple turned around and was like, what. I was like, nothing. Then I guess his friend next to me was, like, you gonna be okay. So I felt like I'm okay because I'm with Purple and nothing happened, — never, ever happened with us. So —

* * *

Q. So you knew, based on what you just said, that — where the car was going, correct, where the group was going, correct?

A. Mm-hmm.

Q. Because you were scared, right?

A. Yes.

Q. Okay, and you didn't see anything happen because you were not up on North Avenue, correct?

A. (No response.)

Q. Is that correct?

A. I didn't see nothing happen because we was in the car.

Q. Right, you were in the car. You never got out of the car, correct?

15

\* \* \*

A.      Yes.

\* \* \*

Q.      And you never once said I'm getting out of here.  I'm leaving.  I don't want to have any part of this.  Is that correct?

A.      No, because I was scared.

Q.      But you were with Ricky, right?

A.      Mm-hmm.

Q.      So does that mean that you were scared of the other people?  Isn't that true?

A.      Yes.

\* \* \*

Q.      Ma'am, I can't hear you.  You're going to have to speak up.

A.      Yes.

\* \* \*

Q.      Ma'am, in your statement to Detective Ross you said that the detectives told you that it was Purple who shot that man, isn't that correct?

A.      No, because I — they didn't say that.  I mean, yes, they told —

[BY THE COURT]:  I can't hear you.[Appellant's counsel], I'm not sure I understand the question.  Could you ask it again?

[BY APPELLANT'S COUNSEL]:  Yes.  Was it the detective who told you that Purple shot that man?

[BY TIA GRANNISON]:  No. Yes.

16

[BY THE COURT]:  Ma'am, we can't hear you.

A.      I think it's yes.

[BY THE COURT]:  You said yes?  I can't hear you.  Ma'am, what is your answer?  Do you know?

A.      Yes.

\* \* \*

[BY COUNSEL]:    Ma'am, you're not charged with anything, are you?

[BY TIA GRANNISON]:   No.

 After the conclusion of  appellant's cross-examination of Ms. Grannison, the State asked Grannison on redirect if she remembered giving a recorded statement to police on February 6, and she replied that she did.  The State then proposed to play for the jury the recording of that statement, the transcript of which appellant had been using to cross-examine Grannison.  Appellant objected, and the parties approached for a bench conference, at which the following colloquy ensued:

> [BY THE COURT]:  And the transcript that you [Mr. Defense Counsel] were using is the one from the same [February 6] statement with Detective Ross?
>
> [BY APPELLANT'S COUNSEL]:  Yes.
>
> [BY THE COURT]:  And that's what the audio is?
>
> [BY APPELLANT'S COUNSEL]:  They provided that to me —
>
> [BY THE STATE]:  That's what the audio is, and that's the one I intend on playing.

17

[BY THE COURT]:  Okay, and so **you're saying that he can't play her testimony, or her statement?**

[BY APPELLANT'S COUNSEL]**:  I don't think he can**.

[BY THE COURT]:  You don't think he can?  Why?

[BY APPELLANT'S COUNSEL]:  **Because it's hearsay**.

[BY THE COURT]:  Well that's a good answer.

[BY APPELLANT'S COUNSEL]:  Yeah.

[BY THE STATE]:  It's the wrong answer though.  Your Honor, under 5 —

[BY THE COURT]:  No, it is hearsay, but it may be an exception.

[BY THE STATE]:  Yes.

[BY THE COURT]:  That's the problem.

[BY THE STATE]:  **Under 5-802.1(b) it's a prior consistent statement being offered after the allegation of fabrication or inducement** or influence.[3]

[BY APPELLANT'S COUNSEL]:  Are you planning to play the whole tape or you playing —

[BY THE STATE]:  Mm-hmm.  Oh, yeah.

---

[3] Maryland Rule 5-802.1(b) provides, in pertinent part:

The following statements previously made by a witness who testifies at the trial or hearing and who is subject to cross-examination concerning the statement are not excluded by the hearsay rule:

\* \* \*

(b)    A statement that is consistent with the declarant's testimony, if the statement is offered to rebut an express or implied charge against the declarant of fabrication, or improper influence or motive[.]

18

[BY THE COURT]:  What has been — what are you —

[BY THE STATE]:  He elicited (inaudible).  Now, granted, it was after much badgering that Detective Ross told her who shot this person.  That it was Purple who shot.

[BY THE COURT]:  Okay.

[BY THE STATE]:  Additionally, that she couldn't recall, remember the names of these other, that she was a willing participant and there's the insinuation that she had not yet been charged for these crimes, all go to the insinuation that this statement, the prior consistent statement was fabricated.

[BY THE COURT]: Okay.  Counsel?  It says that, I'm looking at it, "A prior statement by a witness" — the same one we were talking about before.  So now I have the witness on the stand, and this is a statement that is consistent with the declarant's testimony.  "If the statement is offered to rebut an express or implied charge against the declarant of fabrication or improper influence or motive," and what [the State] is indicating is, because there's been, **based on your cross examination, that you have implied that she's not charged**, —

[BY APPELLANT'S COUNSEL]:  Mm-hmm.

[BY THE COURT]:   — she's not here, and **therefore she must be making this up.**

[BY APPELLANT'S COUNSEL]:  Mm-hmm.

[BY THE COURT]:  So that's why he's saying it's an exception to the Hearsay Rule that he can play this tape.

[BY APPELLANT'S COUNSEL]:  **Okay, but that would have to be a consistent statement**, correct?

[BY THE COURT]:  **Consistent with what she's testifying to.**  Consistent with her —

[BY APPELLANT'S COUNSEL]:  Yeah, but —

[BY THE COURT]:  — testimony now.

19

[BY APPELLANT'S COUNSEL]:  I just cross examined her based on the transcript, about the inconsistencies in her testimony here.

[BY THE COURT]:  But I don't think they were inconsistencies that you testified — you got her — what inconsistency did you get her to testify to?

[BY APPELLANT'S COUNSEL]:  She said that he shot — that Purple shot him and then — remember, I had objected to that because of the foundation, but you said that that's really not relevant it's I have to figure out how to say why she knows that.  In the transcript, or in the recorded statement the detective asks her if anybody told her anything, or what to say about that. That's what I cross examined her on.  That's what he's specifically referring to.

[BY THE COURT]:  But inconsistent would be that if she's sitting here today and she's saying that Purple shot the man.  I mean, I don't — she just said Purple shot him.  Then inconsistent would be that if she said somewhere that Purple didn't shoot him.

[BY APPELLANT'S COUNSEL]:  Mm-hmm.

[BY THE COURT]:  It's not inconsistent that she's saying, well — if she said here today that no one told me that Purple shot the man —

[BY APPELLANT'S COUNSEL]:  Mm-hmm.

[BY THE COURT]:  — and then you put in that someone did tell her that Purple shot the man, if she had said that —

[BY APPELLANT'S COUNSEL]:  Mm-hmm.

[BY THE COURT]:  — that would be inconsistent.

[BY APPELLANT'S COUNSEL]:  Okay.

[BY THE COURT]:  But the fact that you are drawing out some certain things out of her doesn't make it inconsistent.

[BY APPELLANT'S COUNSEL]:  Mm-hmm.

20

[BY THE COURT]  She's agreeing — she has agreed with you, for the most part, everything that you said that she said.

[BY APPELLANT'S COUNSEL]: Right.

[BY THE COURT]:  So what Counsel is trying to do, based on your getting the concessions from her, that she did say those things —

[BY APPELLANT'S COUNSEL]:  Is to rehabilitate her with the —

[BY THE COURT]:  — that **he gets an opportunity to play her statement, Because you have implied that she is making it up.**

[BY APPELLANT'S COUNSEL]:  **But he wants to play it in total, and I think there's a lot — there's hearsay statements in there that don't come in to evidence, regardless.**  So —

[BY THE COURT]:  I don't know what — is she saying that somebody else said something, other than the "they said," "they said"?

[BY APPELLANT'S COUNSEL]:  No.  Well —

[BY THE COURT]:  **Is there something else in there other than the they said they're going to shoot him?**

[BY APPELLANT'S COUNSEL]:  **I don't think so, Your Honor**.

[BY THE COURT]:  So then what's —

[BY APPELLANT'S COUNSEL]:  No.

(Emphasis added.)

At that point in the proceedings, a substantial portion of the statement of Tia Grannison recorded on February 6, 2013, was played for the jury, and the jury was provided a transcript to follow along while the recording played.

21

Notably absent from the argument appellant made to the trial court (quoted above) is any contention that, for the exception under Rule 5-802.1(b) to apply, the prior statement must have been made before the declarant developed any motive to fabricate, which is the sole argument appellant makes on appeal, citing, *inter alia*, *Thomas v. State*, 429 Md. 85, 106-07 (2012), and *Holmes v. State*, 350 Md. 412, 424 (1998). At trial, appellant argued that the statement could not be played because it was hearsay. When the State noted that the statement was admissible under an exception to the hearsay rule, namely Rule 5-802.1(b), appellant responded as quoted above. He did not argue, as he does now, that any statements made to police by Grannison after the crime would have been inadmissible because they were given after her involvement in the crime and therefore were statements made after she had a motive to fabricate. This contention was not made at trial, and has not been preserved for appellate review.

## II. Cross-examination of appellant

Appellant contends that the trial court erred in allowing the State, during its cross-examination of appellant, to ask several questions about whether the prior witnesses against him were lying. *See Hunter v. State*, 397 Md. 580, 589 (2007) ("it is impermissible, as a matter of law, for a witness to give an opinion on the credibility of another witness"); *accord Bohnert v. State*, 312 Md. 266, 277-78 (1988) ("Whether a witness on the stand personally believes or disbelieves testimony of a previous witness is irrelevant, and questions to that effect are improper, either on direct or cross-examination." "Testimony from a witness

22

relating to the credibility of another witness is to be rejected as a matter of law.") ; *Parker v. State*, 189 Md. App. 474, 496-500 (2009) ("As in *Hunter*, the 'were-they-lying' questions the prosecutor asked Parker [the defendant] were improper."); *Hall v. State*, 107 Md. App. 684, 692 (1996) ("Every witness is prohibited from testifying that, in his or her opinion, the testimony given by another witness is false." (footnote omitted)); 6 LYNN MCLAIN, MARYLAND EVIDENCE (3d ed. 2013) § 701:6 ("The prosecution may not ask an accused whether he contends that the State's witnesses are lying."); JOSEPH F. MURPHY, JR., MARYLAND EVIDENCE HANDBOOK (4th ed. 2010) § 1303 ("Because nobody is competent to read anyone else's mind, it is improper to ask a witness whether another witness was 'lying.'").

The State responds that appellant's argument regarding this issue is "mostly unpreserved." The State points out that the court expressly overruled only one of his objections, and the appellant made no motions to strike any of the testimony about which he now complains. The State further asserts that any prejudice would have been minimal.

Although we conclude that appellant preserved an issue relative to asking a witness to comment on the credibility of testimony of other witnesses, we are persuaded that any error in this regard was harmless.

### a. *Preliminary agreement?*

Appellant has characterized as impermissible four questions the State posed to him during the prosecutor's cross examination. The first such question was asked after the

prosecutor had asked a series of questions about the events that transpired prior to the shootings. After appellant agreed with the prosecutor that acquaintances appellant knew as "Tim and Tia" were in the car with him when they stopped on Smallwood Street near the intersection with North Avenue, the prosecutor asked:

> [BY THE STATE]:  ***So everything Ms. Grannison testified to, up until this point, has been true and accurate?***
>
> [BY APPELLANT'S COUNSEL]:  Objection.
>
> [BY APPELLANT]:  No.
>
> [BY THE COURT]:  There's your answer.

(Emphasis added.)

Although appellant argues in his brief that the above question was an impermissible request for appellant to comment on the credibility of a prior witness, it is clear when the question is read in context that the prosecutor was, at this point in the cross-examination, suggesting that appellant's testimony was consistent with Grannison's account of what transpired up to that point in the evening. *See Tyner v. State*, 417 Md. 611, 617 (2011) ("we must consider not only precisely what the focal testimony was at trial, but also the context in which it was used"). Although it would have been preferable for the prosecutor to phrase the question in a manner that did not ask the appellant to agree that the prior witness's testimony had been "true and accurate," we fail to discern any prejudice to appellant flowing from the trial judge's failure to sustain this objection.

### b. *Why would they lie?*

The second and third questions appellant challenges as impermissible came after the prosecutor asked a series of questions based upon Grannison's testimony as to which appellant had given contrary testimony. The second and third questions appellant challenges did not specifically ask "did she lie?" but asked appellant what motive the prosecution's witnesses would have to lie. The pertinent exchange on cross-examination was as follows:

Q. [BY THE STATE]       So Tia, a woman that you had relations for a couple of months, gets shot that morning.  Is that correct?

A. [BY APPELLANT]       I guess so.

Q.       But you didn't do it?

A.       No.

Q.       You didn't stand over Ms. Grannison with a gun and shoot her in the face, did you?

[BY DEFENSE COUNSEL]:  Objection.

[BY THE COURT]:  Overruled.

[BY APPELLANT]:  No, I would never hurt Tia.  I would never hurt anybody.

[BY THE STATE]:  Did you not tell her that "If you ain't blood you're going to die."

[BY APPELLANT]:  I did not tell her that.

Q.       Did you not try to shoot her a third time but the gun jammed?

[BY DEFENSE COUNSEL]:  Objection.

[BY THE COURT]:  Overruled.  You can answer, Sir.

25

[BY APPELLANT]:  No, I never shot anybody.

[BY THE STATE]:  *So help me understand, Mr. Horton.  What motivation would Tia Grannison have to come into this courtroom, sit where you are and testify to this fabrication?*

[BY DEFENSE COUNSEL]:  Objection.

[BY THE COURT]:  If he knows.

[BY APPELLANT]:  I have no idea.  Maybe Tia is scared.  Maybe she was scared.  Maybe she don't want to tell on the people who told on her, so she using me for some sort of outlet.  But I'm pretty sure Tia know I would never hurt her.  Tia knows that, and I'm sitting here today with my life on the line. I got to —

[BY THE COURT]:  Sustained, sustained, sustained.  Next question.

\* \* \*

[BY THE STATE]:  *Mr. Horton, what motivation would [Shanelle] Hopkins have to come into this courtroom and identify you?*

[BY DEFENSE COUNSEL]:  Objection.

[BY THE COURT]:  If you know.

[BY APPELLANT]:  I don't know.

[BY THE STATE]:  Are the same people that Tia's concerned about the same people that [Shanelle] is concerned about?

[BY DEFENSE COUNSEL]:  Objection.

[BY THE COURT]:  Sustained.

[BY THE STATE]:  Is this a conspiracy to get Ricky Horton?

[BY DEFENSE COUNSEL]:  Objection.

26

[BY THE COURT]: Sustained.

(Emphasis added.)

Although the italicized questions did not directly ask appellant if he contended that witnesses Grannison and Hopkins had lied in their testimony, appellant contends that these questions were "clever variations of prohibited 'were they lying' questions," citing *Bohnert, supra*, 312 Md. at 278, and *Hunter, supra*, 397 Md. at 590. We agree with appellant that, under the circumstances, the questions regarding any possible motivation for Grannison and Hopkins to have testified falsely were impermissible, and the trial court erred in not sustaining appellant's objections.

A motive for a witness to testify in a manner that is contrary to a party's interests is normally relevant information that is an appropriate subject of evidence. *See, e.g.*, Maryland Rule 5-616, providing that "[t]he credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at . . . [p]roving that the witness is biased, prejudiced, . . . or has a motive to testify falsely," and further providing that "[e]xtrinsic evidence of bias, prejudice, interest, or other motive to testify falsely may be admitted." Rule 5-616(a)(4) and -616(b)(3). And it is appropriate to cross-examine a witness about the witness's *own* motive to testify falsely. *Marshall v. State*, 346 Md. 186, 192 (1997) ("The constitutional right of confrontation includes the right to cross-examine a witness about matters which affect the witness's bias, interest or motive to testify falsely.").

But, in most instances, when a witness is asked on cross-examination what possible motive another witness might have had to testify in a manner that is contrary to the testimony of the witness being cross-examined, the questioner has no expectation of eliciting evidence that might impeach the *previous* witness. In most instances, when a witness is asked on cross-examination about possible motives of other witnesses, the questioner anticipates that the witness being examined will not be able to offer any evidence of a motive for the prior witness to have testified falsely. Consequently, in most instances, as in the present case, there is no foundation for the question, and the question is tantamount to asking the witness: "So, not only are you are saying the prior witness was lying, but you cannot offer any explanation for why that witness would lie?"

Neither appellant nor appellee cited a case in which the court expressly addressed the propriety of asking a witness on cross-examination what motive a previous witness might have had to testify falsely.  Concerns regarding misuse of an unfounded inquiry about other witnesses' motives were addressed in Michael C. Plaxton, Casenote, *Portuondo v. Agard: Can a Criminal Defendant Be a Credible Witness?*, 27 AM. J. CRIM. L. 279 (2000). The author cites cases from Canada and Australia that have held questions asking "why would the witness lie?" to be objectionable.  The author states:

> The presumption of innocence requires, as a matter of policy, that the accused be regarded as if she had no compelling interest in deceiving the trier of fact.  . . .

> The flipside of this dictum — that the accused may not be subjected to a presumption of unreliability — is the notion that prosecution witnesses

28

(usually complainants) cannot enjoy a presumption of reliability. Such a presumption most commonly arises where the accused, during cross-examination, is asked why a prosecution witness would lie. **The question implies that, if the accused cannot produce a reason why the witness would lie, the witness must be telling the truth.** As the Ontario Court of Appeal noted, [*R. v. Stewart* (1994), 18 O.R.3d 509 (Can.),] the question tacitly suggests that it is the burden of the accused to disprove the allegations leveled against her; that prosecution witnesses should be viewed as presumptively truthful and reliable. This effectively undermines the presumption of innocence and therefore takes on constitutional significance, though the issue has not generally been addressed in constitutional terms. Insofar as this line of questioning adversely impacts the defendant's constitutional right to a fair trial, the prosecution is disallowed from approaching the accused with such a query. Where it is asked, the trial judge must not allow the burden to be shifted to the defendant to disprove the allegations . . . .

\* \* \*

The Manitoba Court of Appeal commented upon the "mischievous" quality of the "why-would-she-lie" line of questioning [in *R. v. R. (A.)*, 1994 MBCA 4524 (Can.)]:

> [Q]uite apart from the irrelevancy of the accused's opinion, this type of question is mischievous in that it tends to place an improper burden on the accused to account for another's conduct. The inability of the accused to explain a conflict between his evidence and that of a Crown witness is not, of itself, a ground for disbelieving the accused. Sometimes, the motivation of an untruthful witness is obscure even to the trained mind of a psychologist.

The leading case in Canada on this issue is *R. v. Kusk,* [1999 ABCA 49 (Can.),] recently decided by the Alberta Court of Appeal. In a unanimous opinion, the court complained that the "why-would-she-lie" line of questioning: "wrongly suggests that a complainant who is not deliberately lying must be correct, and that a complainant without an obvious motive to lie

must be sincere. Neither thing need be true, still less true beyond a reasonable doubt."

* * *

The Australian approach to the "why-would-she-lie" line of questioning similarly conforms to the Canadian experience. In *Palmer v. R.*, [(1998) 151 ALR 16 (Austl.),] the High Court of Australia held that the prosecution cannot question an accused as to the possible reasons why a prosecution witness would fabricate an inculpatory story.

* * *

. . . As the majority in *Palmer* argues, **the inability of the defendant to find some motive to lie on the part of the complainant is without any probative value** that could mitigate the risk of offending the presumption of innocence.

*Id*. at 287-89, 290-91 (emphasis added) (footnotes omitted).

There may be cases in which the party being cross-examined is known to have personal knowledge bearing on the motive of the prior witness to testify falsely, and inquiry into that topic would not be inappropriate in those cases. But this is not one of those cases. Appellant did not claim to know the witnesses' motives for testifying against him, and the record indicates that the prosecutor had no reason to believe that appellant could testify to any facts relevant to the witnesses' motives. Under such circumstances, a "why-would-they-lie" question calls for speculation and irrelevant opinion. Here, rather than require the appellant to respond to the "why-would-they-lie" questions, in the absence of a foundational proffer from the prosecutor that the appellant possessed relevant personal knowledge about

30

the witnesses' motives, the trial court should have sustained the appellant's objections to the questions about Grannison's and Hopkins's motives.

### c.     Were they lying?

Appellant also complains about a fourth "were they lying" question. That portion of the cross-examination was a follows:

[BY THE STATE]:  *So Ms. Grannison, [and Shanelle] Hopkins came in here and told stories, according to you?*

[BY DEFENSE COUNSEL]:  Objection.  Asked and answered.

[BY THE COURT]:  Overruled.

[BY APPELLANT]:  Yeah.

(Emphasis added.)

As the State points out in its brief, the specific objection asserted with respect to this question was not that it was prohibited — by *Hunter* and similar cases — because it asked one witness to comment upon the credibility of other witnesses. Instead, the sole objection asserted was that this question had been "[a]sked and answered." Although the question was clearly impermissible under *Hunter*, the Court of Appeals has consistently held that, "'where specific grounds are delineated for an objection, the one objecting will be held to those grounds and will ordinarily be deemed to have waived grounds not specified.'" *Thomas v. State*, 301 Md. 294, 328 (1984) (quoting *Jackson v. State*, 288 Md. 191, 196 (1980)). Consequently, appellant's contention that this fourth question was an impermissible "were they lying" question has not been preserved for our review.

### d. *Harmless error*

With respect to the objections to the second and third questions (about possible motives for Grannison and Hopkins to lie), even though we conclude that appellant's objections to those two questions should have been sustained, such errors have been analyzed under the harmless error standard. *See, e.g.*, *Brooks v. State*, 439, Md. 698, 735-36 (2014) (even if it was error for the trial court to permit a nurse witness to testify that her "examination would verify the story that [the complaining witness] told me," such error was harmless); *Robinson v. State*, 151 Md. App. 383, 393 (2003) (error in permitting detective to testify that complaining witness's statements to him were consistent was harmless beyond a reasonable doubt). *See also Ware v. State*, 360 Md. 650, 679-80 (2000) (permitting witness to testify that "the prosecutor and detective said he was being truthful," although inadmissible, "was harmless beyond a reasonable doubt").

In the instant case, there was substantial evidence in addition to the testimony of Grannison and Hopkins corroborating the State's contention that appellant shot and killed Sean Rhodes, shot Rudy Hyman, and shot Tia Grannison. The State obtained surveillance video of the area around Rasta's from the owner of a business located at the corner of North Avenue and Smallwood Street. The owner of the business testified that he had installed the surveillance system himself, that it contained "roughly about 50 cameras, inside and outside," that the outside cameras are equipped with infrared, so they can record in the dark; and that the cameras are motion-sensitive, and run 24 hours a day. The video recording played for

the jury did not show the shooting, but did show appellant falling down as he was getting back into the car after Rhodes and Hyman had been shot. Appellant agreed that it was he shown on the video. He conceded that he was on Smallwood Street at the time of the shootings of Rhodes and Hyman, even though he claimed he did not shoot them. His testimony was that he was scared by the sound of the gunfire and he ran away.

Tia Grannison and Shanelle Hopkins did not know each other, yet each independently identified appellant as the perpetrator of shootings that were closely connected in time and place. Shanelle Hopkins testified that she saw her fiancé, Sean Rhodes, get shot in the face by appellant. She picked appellant out of a photo array on January 16. She wrote on the back of the array: "This is the guy that shot Sean." Hopkins also made an in-court identification of appellant as the person who shot Rhodes. As she testified:

[BY THE STATE]: Now, Ms. Hopkins, in the course of police showing you [the photo array], did they tell you who to pick out?

[BY THE WITNESS]: No.

Q. Did they threaten or force you to pick out anybody?

A. No.

Q. The person that you picked out is whom to you?

A. The guy that killed my daughter's father.

Q. And are you certain of that identification?

A. Yes, I am.

Q. And looking at the Defendant today, is that the same person?

33

A.      Yes, it is.

Tia Grannison also picked appellant out of a photo array on January 16, identified him again in a recorded statement on February 6, and identified him in court as the person who shot her on January 13. Appellant admitted that he had known Grannison for at least a couple of months, that they had been intimately involved, and had been together during the hours leading up to the shootings.

Under the circumstances, given the volume of evidence in the case, and the fact that two totally unrelated witnesses identified appellant as a shooter, we are able to express a belief beyond a reasonable doubt that the brief testimony of appellant (quoted above) in denying knowledge of any motive for Grannison and Hopkins to fabricate their allegations did not contribute to the rendition of the guilty verdict.

### III.    Jury instruction as to testimony of an accomplice

Appellant complains that the court erred in denying his request that the jury be given a "testimony of accomplice" instruction as to Tia Grannison. *See* MPJI-Cr 3:11B, which provides, in part: "An accomplice is one who knowingly and voluntarily cooperated with, aided, advised or encouraged another person in the commission of a crime. The defendant cannot be convicted solely on the uncorroborated testimony of an accomplice." Appellant urged the court to give the instruction "based upon [Grannison's] testimony, going along for the ride knowing that the group was planning on killing Sean Rhodes. That squarely falls within aiding and abetting and she would be considered an accomplice." The prosecutor

responded that "Ms. Grannison is not an accomplice in this," and pointed out for the court that the Comment to MPJI-Cr 3:11 states: "An accomplice is one who, knowingly and with common criminal intent [participated, cooperated, aided, or abetted the principal offender . . .]." The court advised counsel that the judge would consider the instruction overnight and advise them the following morning whether she would give an instruction regarding Grannison being an accomplice.

The following day, the trial judge advised counsel that the court would not read MPJI-Cr 3:11B. The court observed that the Comment to MPJI-Cr 3:11 states that an accomplice is one who acts "knowingly and with common criminal intent." The court explained: "That's the hold up because there's been no evidence that there was a common criminal intent that you can attribute to Ms. Grannison that would make Ms. Grannison an accomplice."

Appellant did not renew the objection after the court instructed the jury without reading MPJI-Cr 3:11B. The State argues on appeal that appellant's failure to renew the objection after the court instructed the jury waived the objection because Maryland Rule 4-325(e) provides:

> No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

The State further asserts that appellant expressly waived any argument about the court's failure to give the accomplice instruction because defense counsel responded in the affirmative to the court's post-instructions query of "Counsel satisfied?" But that question was posed after the court gave a clarifying supplemental instruction, and, when read in context, cannot be reasonably interpreted as a waiver of all previously argued objections to the instructions.

The Court of Appeals has held that, if certain conditions are met, substantial compliance with Rule 4-325(e) may be sufficient to preserve arguments for appellate review even if the party fails to renew the objection on the record after the jury has been instructed. In *Gore v. State*, 309 Md. 203, 209 (1987), the Court of Appeals said:

> Several conditions for the establishment of substantial compliance with Rule 4-325(e) emerge from *Bennett* [*v. State*, 230 Md. 562, 568-69 (1962)]: there must be an objection to the instruction; the objection must appear on the record; the objection must be accompanied by a definite statement of the ground for objection unless the ground for objection is apparent from the record and the circumstances must be such that a renewal of the objection after the court instructs the jury would be futile or useless.

> We are satisfied that Gore's objection at the bench conference was sufficient to establish substantial compliance with Rule 4-325(e) and therefore will review his assignment of error.

In the present case, appellant's objection to the court's refusal to give MPJI-Cr 3:11B was preserved by substantial compliance with the requirements of Rule 4-325(e) because the request for the instruction was clearly brought to the court's attention in open court, counsel's reasons for requesting the instruction were stated on the record, the court had

ample opportunity to consider the request and did consider the request, and the court's explanation of why the instruction would not be given was unequivocal and not likely to change if the exception was restated after the court gave its instructions.

But we find no merit in appellant's argument that he was prejudiced by the trial court's refusal to instruct the jury pursuant to MPJI-Cr 3:11B. There was no evidence to generate an issue of whether Grannison was an accomplice. No witness — not even appellant — suggested Grannison participated in the shootings of Rhodes and Hyman "knowingly and with common criminal intent."

Moreover, the general principle that a "defendant cannot be convicted solely on the uncorroborated testimony of an accomplice" is a moot point at best given the fact that another eyewitness to the shootings — Shanelle Hopkins — identified appellant as the shooter. Consequently, even if it could be said that there was some evidence that Grannison could have been considered a accomplice, there was ample corroboration for her testimony, and the failure to give MPJI-Cr 3:11B was harmless beyond a reasonable doubt.

## IV.    Improper sentencing considerations

At the time of sentencing, the trial judge made extensive preliminary remarks about the impact of appellant's crimes on the surviving victims and their families. The court expressed empathy and explained that her own nephew had been shot in the head, "very similar to Mr. Rhodes." The court's comments also included Biblical references and references to faith and God. On appeal, appellant contends that these comments suggest that

the sentencing judge was motivated by impermissible considerations. Appellant asserts that

we should vacate his sentence and remand the case for resentencing because, he contends:

> The trial court in this case expounded at great length about her own, quite tragic, experience as the family member of a murder victim. The trial judge explained that she was so close with her [murdered] nephew that "it was just as if he were my child," and in fact later referred to him as "my child." She spoke at great length about what ["]her["] child may have been feeling, or suffering "with that searing fire in his head." The judge spent an enormous amount of time speaking directly to the mother of the murder victim, sharing with the mother her own experience as the parent [sic] of a murder victim, her fears about the suffering of her child and her anguish when the jury found the person charged with the murder not guilty.  . . . [After discussing the witnesses,] the sentencing judge circled her comments back to the victim's mother — quoting a scripture from her faith, adding yet another level of inappropriate content.
>
>     . . . While the court admittedly did not explicitly state that her sentence was based on those considerations, they had no place at that sentencing at all. And a reasonable person could easily infer that the court may have been motivated by an impermissible consideration when it imposed sentence. . . .[4]

---

[4] The sentencing judge's comments prior to announcing the sentence included the following:

> THE COURT: Thank you.  Mr. Horton, you heard me speak to Ms. Ewell [the decedent's mother] earlier about what I believe our obligations are when tragedy such as this happens to us.  And I say "to us," because it did not only happen to Ms. Ewell. It's happened to me.  Where someone who you care about so much, although it was not my child, it was just as if he were my child. It was my brother's child. Was shot in his head, very similar to Mr. Rhodes. And I tell you what you think about, because it's your baby, it's your child.
>
> You wonder, oh, my God, was he suffering.  That's what you wonder. You wonder that while he laid there waiting for somebody to come and see about him, what was he feeling.  At the same time you worry about that and it weighs on you, you pray hard.  That if God was going to take him, that he

(continued...)

38

takes him right away. Because you don't want him, or even the idea, of him suffering with that searing fire in his head. That's what it is. It's searing fire that's going off in somebody's head. And that's what you wonder about. But our obligation is to live the life that we taught them to live. That's our obligation. So that whoever we believe took it from them doesn't win anything else.

We would have easily laid down and died right along with them. We could have given up. We could have decided that — and I'm going to tell you what almost happened to me. I almost gave this robe up, I'll tell you that. Because in my case, in the case with my child, the jury found that he was not guilty. And to me, the very system that I trusted, the very system that I've raised my right hand to honor and to do my best by, let me down. In my opinion. And that's all it really was at the end of the day, was my opinion. I don't know whether the jury was right or they were wrong. I don't know.

But I swore to do is, is that whenever I am faced with any case, whether it's murder of it's of an adult or a child, or it's a robbery case, or whatever. My job is to make sure that you get the fairest trial that I can possibly give you or any defendant that comes before me. That's my obligation. And my obligation is to also let the jury do its job. Often times a jury comes back and I'm sitting here thinking to myself; what trial were they listening to? Because I might have come up with a different ruling. But that wasn't my job. My job was to make sure that you received a fair trial.

But I have to admit that when the jury came back on this one, I wasn't shocked. I was not shocked. And I tell you what convinced me. Because I sit in a lot of cases where witnesses come in and they are scared to the point of silence. Because we have so created an atmosphere in this world that if you tell the truth, if you stand up for yourself, that you or yours could suffer the consequences of it. That's the society that we're now living in. Is that you can't come in to Court and raise your right hand, and tell the truth, for fear of all of the people that are in the room, and fear of all of the antennas that the players in the courtroom have in the community. Knowing that when they walk out of this courtroom, that Judge Brown and the officers that are around me, and around the Defendant, may or may not be there when they need them.

(continued...)

39

The State argues that the claim of error is not preserved, and, in any event, appellant "cites no authority indicating that impermissible considerations include a trial judge's own experience having a relative murdered, or the trial judge's reference to a Bible verse."

---

[4](...continued)

That's what has been created in our society. But when Ms. Grannison took the witness stand in here, I fully suspected that Ms. Grannison was going to sit up here and deny every single thing that the Prosecutor was asking her. That was what I expected. But Ms. Grannison stood as flatfooted as she could. And I'm going to tell you something. I say "as she could," because she shook the entire time she was sitting there. She was the most believable witness there was in this courtroom, was Ms. Grannison, because of her courage. The jurors saw what I saw.

She had a hard time talking about it, but she pressed forward, she pressed through it. Even though you were sitting as close to her almost as anybody else, other than your lawyer, in this room. And she held you accountable. She did her job. And the jury believed her, as did this Court. Ms. Ewell has stepped out. But if anybody wishes to give her the word from me is, is that the thing that kept me going, and it was at — I don't know where I heard this scripture, I don't know where it was. I do know where it was, but it's not applicable to this. But there's a scripture in my faith where it talks about the day I fear the most has come upon me. It's out of Job. And that's what Ms. Ewell — because as parents, you send your children out into the world. And the day you fear the most is when they don't come back.

And I know you're sitting there grinning at me, and smiling at me, as if this doesn't matter to you. And I know it doesn't. Which makes my job easier. Because as I say, it doesn't matter to you. And you shook you head; no, it doesn't. It makes my job easier. But tell her that in that story, keep reading, keep reading. Because although the day you feared the most has come up on you, the years that were taken away from you will be returned unto you. I believe that, too. But for those that don't believe, you don't get it. But I got that, too.

So I'm going to stand down, stand down from my soapbox, but I'm going to give you your sentence, sir. Stand, please.

40

Appellant concedes in his brief that he "did not object at the time the court made the remarks in question, and did not object at the time the court imposed sentence." Nevertheless, he urges this Court to consider his claim under the doctrine of plain error review. Appellant relies heavily on *Abdul-Maleek v. State*, 426 Md. 59 (2012), a case in which Abdul-Maleek alleged on appeal that his sentencing judge had punished him more harshly after his conviction in the circuit court because he had taken a *de novo* appeal from his conviction on the same charges in district court. In that case, as in the instant case, Abdul-Maleek did not object at sentencing. The Court of Appeals expressly ruled that Abdul-Maleek had not properly preserved his objection about improper sentencing considerations, stating, *id*. at 69:

> **[W]e have consistently recognized that allegations of impermissible considerations at sentencing are not "illegal sentences" subject to collateral or belated review and "must ordinarily be raised in or decided by the trial court. . . . [A]nd, subject to the appellate court's discretion under Maryland Rule 8–131(a), the defendant is not excused from having to raise a timely objection in the trial court."** *Id*. at 466–67, 918 A.2d at 510.

> Petitioner recognizes that his challenge does not fall within the narrow class of inherently illegal sentences to which the general rules of waiver do not apply. **He asks, though, that we expand the application of the preservation exception to the circumstances of this case. We decline to do so, as there is no good reason why either the circumstances presented here should be exempt from the preservation requirement or the trial court should not have been given the opportunity to address at the time the concern that Petitioner now raises.**

(Emphasis added.)

41

Despite the forgoing discussion reaffirming the requirement that objections to improper sentencing considerations be raised in the circuit court, the Court of Appeals elected to exercise its discretion to review Abdul-Maleek's unpreserved claim on appeal. The Court commented that it was moved to exercise its discretion because there would be no prejudice to either party if the Court remanded for resentencing, and reviewing Abdul-Maleek's claim would give the Court an opportunity "to comment on the sentencing issue in the context of de novo appeals and thereby promote the 'orderly administration of justice.'" *Id*. at 70 (quoting *Bible v. State*, 411 Md. 138, 152 (2009)).

We are not similarly moved to exercise our discretion to excuse appellant's failure to raise any objection in the circuit court in response to the sentencing judge's comments. In *Reiger v. State*, 170 Md. App. 693, 700 (2006), we observed that such objections should be brought to the attention of the sentencing judge while there is an opportunity to clarify the court's motivations:

> **When, as in this case, a judge's statement from the bench about the reasons for the sentence gives rise to the claim of impermissible sentencing considerations, defense counsel has good reason to speak up.** A timely objection serves an important purpose in this context. Specifically, it gives the court opportunity to reconsider the sentence in light of the defendant's complaint that it is premised upon improper factors, or otherwise to clarify the reasons for the sentence in order to alleviate such concerns. *See* Md. Rules 4–342, 4–345. As recognized in the rule, it is the availability of an opportunity to ask for and obtain immediate relief from the sentencing court that determines whether a contemporaneous objection is necessary. **Simply stated, when there is time to object, there is opportunity to correct.** *Cf. Graham v. State,* 325 Md. 398, 411, 601 A.2d 131 (1992) (defense counsel had adequate time to object to trial court's failure to disclose entire contents of jury's note and waived right to appeal on that point by failing to do so).

170 Md. App. at 701 (footnote omitted) (emphasis added).

Appellant suggests in his brief that asserting an "objection under the circumstances would have come across as argumentative and disrespectful and would have risked drawing the ire of the court, which could have imposed an even greater penalty." We do not accept the argument that fear of reprisal is a sufficient excuse for trial counsel failing to raise a timely objection. *See Kamara v. State*, 184 Md. App. 59, 81-82 (2009). In the overwhelming majority of instances, a professionally lodged objection will not be met with hostility. We see no reason to conclude that this case would be one of the rare exceptions to that. And the rules also provide for motions for modification after the sentencing hearing. Maryland Rule 4-345(e). We are not persuaded that appellant is raising an error that is "compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *State v. Hutchinson*, 287 Md. 198, 203 (1980). We decline to exercise our discretion to overlook appellant's failure to raise the issue in the circuit court.

**JUDGMENTS OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**